JOHN KRAMME ET AL. *vs.* J. CLINTON MEWSHAW.

*Sale by Conventional Trustee—Validity—Adequacy of Price—*
*Necessity of Advertisement—Appeal by Joint Trustee.*

The evidence of a witness in direct contradiction of her sworn answer can be given but slight weight, particularly when her testimony is in itself contradictory and denied.   p. 542

That the purchaser, at a sale made by a conventional trustee, falsely stated that the purchase was for a firm in another city, not affecting the result, was negligible for the purpose of a suit to set aside the sale.   pp. 543, 545

A sale, made by a conventional trustee within the power conferred by the instrument under which he acts, will not be set aside for a possible mere error of judgment.   pp. 546, 547

One to whom land has been devised in trust with a power to sell derives his appointment and his power from the testator by virtue of the will, and so he may sell without the sanction of the court, and his discretion in the manner of sale will not be controlled, except in the event of its clear abuse or of bad faith, resulting in injury to the trust estate.   p. 547

A private sale may be made by a conventional trustee without the counsel or aid of real estate agents, and without prior advertisement, and for cash, provided it is neither in violation of the terms of the trust nor made in bad faith or for a grossly inadequate price.   p. 547

A conventional trustee over whose trust the court has not assumed jurisdiction is the special agent (trustee) of the creator of the trust, with the power to exercise his own discretion according to the nature of his estate granted and within the scope of the power conferred, while a trustee under a decree is an officer or arm of the court.   p. 547

If the court assumes jurisdiction of the trust, the situation of the conventional trustee is so far changed that he must thereafter secure the sanction or ratification of the supervising court for the successive steps in the administration of the trust.
pp. 547, 548

A trustee under a decree has his functions prescribed and limited from time to time by law, and by the orders and decrees of the court appointing him, and he must as a rule comply in every essential respect with all the modal regulations of equity, and offer the property in such a manner as to bring its fair market value, and exercise the prudence that a careful owner would exercise in the sale of his own property. p. 548

A conventional trustee, who is proceeding without the assumption of jurisdiction by the court, is not affected by the regulations of the mode of sale in chancery, but he is bound, in the effort to secure the fair market value of the property, to employ that degree of care which a reasonably prudent man would exhibit in the conduct of a similar sale. p. 548

If a sale is made by a conventional trustee in good faith and according to his best judgment, the sale will not be set aside unless there exists an inadequacy of price that, under the circumstances, is directly attributable to some failure of reasonable diligence or effort in the making of the sale. p. 548

Testimony by two real estate agents as to the price at which they were ready to buy the property, making a small cash payment and paying the balance at times named, *held* not sufficient evidence of market value as a basis for setting aside the sale for inadequacy of price. pp. 549, 550

A speculative effort by a witness to calculate the conjectural profits obtainable at the end of a remote period by developing the property with a view to the sale of lots, *held* not to afford a safe foundation for fixing the present market value. p. 550

The burden of proof is on one seeking to set aside a private sale made by a conventional trustee under an express power of sale, on the ground of inadequacy of price. p. 550

Both an inadequacy of price and a justifiable expectation of securing a higher price must co-exist before a court will set aside a contract of private sale made in good faith by a conventional trustee in the exercise of a discretion incident to an express power of sale. p. 551

On a bill to set aside a private sale of land made by a conventional trustee, *held* that the evidence did not show that the manner of making the sale, under all the circumstances, was imprudent or other than such as a provident owner would rea-

sonably have employed in the sale of his own similar property under like conditions, or that the sale was for such an inadequate price as would justify the interference of a court of equity.

pp. 551, 552

From any decree which would materially affect the amount or control of an estate held by joint trustees, or the rights and interests of the beneficiaries so represented, the trustees have a joint right of appeal.                          p. 552

One of two conventional trustees cannot prosecute an appeal, although she has a substantial interest in the estate affected by the decision, if she is a party to the proceeding merely in her representative capacity.                          pp. 552, 553

*Decided March 20th, 1925.*

Appeal from the Circuit Court for Anne Arundel County, In Equity (Moss, J.).

Bill by James Clinton Mewshaw against Ritta Frances Hammond and Annie Eleanor Phelps, trustees under the will of Ann Eliza Mewshaw, deceased, to which John Kramme was, on his petition, made a party defendant. From the decree rendered the said John Kramme, and Ritta Frances Hammond, trustee, appeal. Decree reversed in part and affirmed in part.

The cause was argued before BOND, C. J., PATTISON, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Edward J. Colgan, Jr.,* and *John D. Nock,* with whom were *Louis J. Jira and Benson, Nock & Rowe* on the brief, for the appellants.

*Harry E. Karr,* with whom was *Irving C. Goldstein* on the brief, for the appellee.

PATTISON, J., delivered the opinion of the Court.

Ann Eliza Mewshaw died testate on February 22nd, 1919, and by the second section of her will she created an active

trust by devising to her daughters, Ritta Frances Hammond, wife of Herbert Hammond, and Annie Eleanor Phelps, wife of Roland Phelps, and the survivor of them, as trustees, certain real estate for the purpose of managing and paying the net income therefrom, or from the proceeds of sales of any or all of said real estate, after the deduction of taxes, expenses, charges and commissions, to her son, Benjamin Franklin Mewshaw, for life, with remainder to the said Ritta Frances Hammond, Annie Eleanor Phelps, and her son, James Clinton Mewshaw, as tenants in common. The textatrix directed that the land so devised in trust should be subject to a charge of $2,000 for the benefit of her daughter, Annie Eleanor Phelps, but, as this bequest was duly paid before the present controversy arose, the provisions of the trust in reference to it need not be set forth. The trustees were given the power to sell and dispose of any or all of said property so devised to them in trust, without any obligation on the part of the purchasers to see to the application of the purchase money; and with power to invest and reinvest the net proceeds.

The testatrix was survived by her two daughters, the beneficiary for life, and the other child, James Clinton Mewshaw, who are the only parties in interest under the trust declared by this second section of her will. The corpus of the trust embraced three separate parcels of real estate that were in Anne Arundel County and that consisted of a farm of one hundred and sixty acres, more or less, known as the "Waterford Farm"; another farm of fifty-six acres of land, more or less, called the "Jenkins Farm," and some improved land in the village of Brooklyn. The two trustees accepted the trust and administered it without the aid or supervision of equity. They first sold the larger farm and, after the smaller farm failed to yield any net revenue, the trustees made sale of it on August 13th, 1923, to John Kramme for $25,000. It is this second sale which has caused the present controversy, which arose in this manner.

One of the three remaindermen, James Clinton Mewshaw,

filed a bill of complaint on December 31st, 1923, against the two trustees, alleging the creation of the trust under the will of Ann Eliza Mewshaw; the interest of the complainant and of his two sisters as the remaindermen, and that the trust was not being administered under the jurisdiction of chancery. These are introductory averments to the principal charges which were (first) that the "complainant feels that said trust should be under the jurisdiction of this honorable court, and that said" trustees "should be directed to give a bond in such sum as this honorable court may deem proper, in accordance with the value of said trust estate"; and (second) that the complainant had been advised of the sale of "Jenkins Farm" at $25,000; that the deed had not been executed and delivered to the purchaser; and that, "if said report is correct, it is the opinion of this complainant that said sale is at a price which is entirely inadequate, as said real estate in the opinion of this complainant is valued in excess of thirty thousand dollars."

On these meagre statements, the complainant prayed specifically (a) that the court of equity assume jurisdiction of the trust, (b) that the trustees be required to give a sufficient bond, and (c) that the trustees be required to show cause why the said sale should not be reported for ratification, and that pending the report of sale, they be enjoined from transferring the land to any proposed purchaser. There was, also, the prayer for general relief.

The bill of complaint was verified by the plaintiff, and on the day of its filing the chancellor passed an order requiring the trustees to show cause, on or before January 18th, 1924, why the equity court should not take jurisdiction and they give bond as trustees.

The trustees answered separately, through their respective solicitors, and each trustee verified her answer. Ritta Frances Hammond's answer as trustee was that she and her co-trustee were administering the trust without the aid of chancery in order to save the expense, and that the complainant had no right to require the trustees to carry the

trust into equity and to give bond, because she and her co-trustee had, "in the best of faith and without any abuse of authority or of discretion, fairly executed the duties" of their trust. She admitted the sale of the Jenkins Farm for $25,000, and asserted that the sale was made in good faith, in the exercise of a sound discretion, at a fair and reasonable price, and for the interest and advantage of the trust and all the parties in interest. The answer concluded with a defense by way of a demurrer. The answer of Annie Eleanor Phelps, trustee, was similar in the facts set forth, but it did not contain a demurrer, and it indicated a willingness to comply with any order of the court with respect to a bond.

On the request of her counsel the demurrer of Mrs. Hammond was set down for hearing, but, before it took place, John Kramme filed a petition in the cause disclosing that he was the purchaser who had been referred to but not named in the proceedings; and, on his request, he was made a party defendant. His answer, with a reservation of all his rights by way of demurrer, was a denial of the inadequacy of the price, and contained a narrative of circumstances attending the purchase and conditions affecting the property that would have justified the sale. An outstanding feature of the answer was the declaration that "the said J. Clinton Mewshaw was thoroughly conversant with all the proceedings, interviews and conversations which took place between this respondent and said trustees, and moreover the said J. Clinton Mewshaw agreed with your respondent prior to the conclusion of said negotiations that twenty-five thousand dollars cash was the fair market value of said real estate."

With the pleadings in this shape, the parties agreed that the case should be heard upon bill, answer (including all defenses allowed under the twentieth general equity rule) and testimony taken in open court. In conformity with this agreement, the cause was set for testimony in open court and hearing as agreed. The court carefully considered the testimony, and wrote a lengthy opinion, in which he clearly set forth the grounds for his conclusion that the court should

assume jurisdiction of the trust and the sale should be set aside. The decree was passed on August 19th, 1924, and by it the court assumed jurisdiction of the trust, enjoined the trustees from any further proceedings with respect to the sale, which it set aside; directed the trustees to reimburse the purchaser for all moneys expended by him on account of the purchase, and to pay the costs out of the funds of the trust estate. It will be seen that the decree granted all the relief prayed for, except that it did not require the trustees to give a bond in any penalty.

An appeal from the decree was taken by the purchaser, John Kramme; and then, after leave granted by the court, Ritta Frances Hammond took an appeal as trustee.

There is no question that the trustees had the power, and that it was sound judgment, to sell the farm. Whether jurisdiction should be assumed and the sale upset turns on (1) the method of making the sale and (2) the inadequacy of the purchase price.

1. The subject matter for sale was an unprofitable truck farm, under tenancy, a short distance outside of the limits of Baltimore, containing fifty-six acres of land, more or less. It adjoins several land development projects, and has a frontage of about eighteen hundred feet on the Annapolis Boulevard, a public highway from Baltimore to Annapolis, and is about a mile from the end of the street car line in the village of Brooklyn. It is improved by two frame houses, at the front and back of the farm, and by small outbuildings. Because of its location all of the land, except ten or twelve acres, is suitable for a lot development enterprise. It was assessed for $17,000.

The trustee Annie Eleanor Phelps, when called upon by the order of the court to show cause why the sale made by her and her sister as trustees to John Kramme should not be set aside, said, in an answer prepared for her by her solicitor and sworn to by her, "that said farm has always been unproductive, the rent received for the same being scarcely more than enough to pay taxes, insurance and other expenses, and

that every effort has been made to sell said farm at a larger price, but without avail, and that the said trustee believed at the time of entering into said contract of sale, that the price agreed upon in the contract was a very good one and that the sale was for the benefit of all persons interested in said trust estate." The respondent made oath to this answer on January 12th, 1924. It was a formal, deliberate and considered defence, which she interposed under the most solemn sanction known to the law, yet in less than one month, she was called as the chief witness for the complainant, and she testified that she had never made any effort to dispose of the Jenkins Farm, nor gone to any real estate dealer, nor advertised it in any fashion, nor consulted any one in regard to its sale except her brother, the life beneficiary and her sister. She did not have the property appraised, and she did not ask any one as to its value, and that she "really did not know the value of the property."

When she was confronted with her conflicting statements in the sworn answer, her halting and discrediting explanation was that she had left the answer to her solicitor or that she had made the answer "to clear" herself, although she testified that she had changed her mind as to the advisability of the sale shortly after she had committed herself to the price.

The evidence of a witness, who thus presents herself to the court, can be given but slight weight, particularly when her testimony was in itself contradictory and denied. For instance, she testified at one point in regard to the farm: "Never asked a soul to purchase it or what it would bring. A man several years ago told me it ought to bring $50,000, but I thought it was no use to keep it a hundred years and starve the man to death, paying expenses on it, better get half a loaf if you can't get a whole loaf." Bruner R. Anderson, Esq., testified for the complainant that at the time the trustees sold the Waterford Farm, Mrs. Phelps asked him to try to sell the Jenkins Farm, and, when he inquired of her what she thought it was worth, her reply was $50,000, and the matter dropped there, as the price did not interest him.

Again, Kramme, who is a real estate agent, testified that he had known for two years before his purchase that the property was on the market, and that his information came from J. Clinton Mewshaw, the brother. Kramme further swore that eighteen months before the sale he and J. Clinton Mewshaw were considering buying the property together and developing it, and that he sent Mewshaw to his sister, Mrs. Phelps, to see what price he could get on the property, and he returned with the message that the trustees were talking about $50,000. About six months afterwards, Kramme testified he went to see Roland Phelps, and inquired of him if Kramme would be paid a commission, if he could find a purchaser, and Phelps saw his wife, and stated that a commission would be paid and Kramme offered the property without success. This testimony is all the more significant as it comes from witnesses while testifying on the call of the complainant.

The evidence on the record supports the view that the trustees had desired to sell the property, but placed too high a value upon it to get a buyer. After Kramme's unsuccessful efforts to find a bidder, he went alone to see the trustee Annie Eleanor Phelps, and began negotiations with her for the purchase of the farm. He said that he represented a New York firm, which was untrue, but immaterial. Kramme offered $20,000, but Mrs. Phelps asked $30,000, and Kramme left for the ostensible purpose of conferring with his client. He returned and said his party would not give $30,000, but would give $25,000. Mrs. Phelps then wrote to her co-trustee, Mrs. Hammond, a letter, under date of July 19th, 1923, which, in view of the conflicting statements of Mrs. Phelps, is important enough to justify its insertion, and the reply of Mrs. Hammond:

"Brooklyn, Md., July 19th, 1923.
    "Dear Ritta:
    "What do you think the Jenkins' Farm should bring and what would you be satisfied to sell for?
    "There is a man from New York will buy it, but won't give but $25,000. I asked $30,000. I told him

I would have to ask you, and also see the orphans' court about it before making any deal. As you and I both know that property is paying nothing, and from the looks of the crops on it this year it doesn't look as if Ed would be able to pay his rent, and you know what that means when he fails to pay it.

"I thought if he would give the $30,000 that would bring in $1800 per year at 6 per cent., and be a nice little income. If it were mine I would do it quick.

"I am sending another statement and check for you to sign. There is not money enough to pay me up to date in bank, so I am sending part as you will see by the date. Kindly attend to this and let me know your views on selling the farm.

"Yours truly,

"Nellie."

When Mrs. Hammond received the offer, she consulted her husband, who thought it was a good price. She also testified that she talked to her sister, whom she knew would "get the highest dollar she could," and her sister told her that "if it was her's she would sell it quick," and that her husband, Mr. Phelps, who was a farmer and had lived long in the neighborhood of the property, thought it was a good price. In addition to this, Mrs. Hammond testified that her conclusion as to the adequacy of the price was based upon her knowledge of what property in the vicinity of the "Jenkins Farm" had brought some six years before, when the last sales of similar property had been made but when the neighborhood was not so thickly settled. She communicated her judgment in this reply to her sister's letter:

"Baltimore, Md.

"Dear Nellie:

"You asked me what I think the Jenkins Farm should bring, and also state you have a man from New York that will give you $25,000 for it. As regards what I think that matters very little. There was a time when it would have brought possibly $35,000, but you said you could get $50,000, and that time has gone by maybe forever and maybe in a hundred years

hence.  So as conditions exist, and you think it is
doubtful about getting the rent, that of course is very
hard on Frank's income, cuts him down considerably.
Therefore, use your own discretion and sell while
selling is good.  I am willing for sale if you are.

"Very sincerely,

"Ritta."

On the receipt from the co-trustee of this authority to sell,
Mrs. Phelps resumed the negotiations with Kramme, who
consented to pay $25,000 clear of all commissions, and a
written contract of sale was afterwards drawn up by the
attorney for Mrs. Hammond and was executed by all the
parties on August 13th, 1923, which was about three weeks
after the terms of the sale had been concluded.  By the con-
tract $500 was to be paid in cash before the contract was
signed; $2,500 became due at the time possession was given,
and the residue when the sale was ratified, if ratification were
found necessary or, if not, on delivery of title and possession.
The purchaser paid the $500, but he made no further pay-
ments for the reason that he did not get possession of the
property.

During these unhurried negotiations between the purchaser
and the trustees, the court has not found anything but the
usual matching of wit against wit in the effort of the vendors
to sell as high, and the vendee to buy as cheap, as possible.
Nothing occurred in the course of the transaction on which
to base a charge that the sale was induced by fraud, deceit,
misrepresentation, or other wrongdoing by the buyer, or was
the result of any material dereliction of duty on the part of
the trustees, who acted throughout honestly and in good faith.
The concealment of the identity of the buyer, by the reply
that it was a New York firm, did not affect the result and was
a negligible falsehood.  *Continental Trust Co. v. Balto.
Refrig. Co.,* 120 Md. 450, 458, 459.

In this connection, reference may be made here to the two
letters of the purchaser to Herbert Hammond, husband of

one of the trustees, dated May 9th and June 1st, which were offered in evidence by the complainant. The later letter was the result of the writer receiving no response to his first one, and both suggested the co-operation of Hammond for an indicated, although undefined, reward, in an attempt to be made by Kramme to find a purchaser for the Jenkins Farm. Whatever significance might have been attached to these letters under different but conceivable circumstances is removed by the uncontradicted testimony, largely on the part of the complainant, that the active negotiations which led to the sale were in the hands of Annie Eleanor Phelps as trustee, and that in their course she did not have any communication with Herbert Hammond but acted upon her independent judgment, with the consent of her co-trustee, whose assent to the sale was not induced in any way by Herbert Hammond. Furthermore, Hammond did not reply to the letters, and Kramme, when testifying as a witness for the complainant, said that he had never had any conversation in reference to the farm with Hammond, who had received nothing by way of commission or otherwise and had no interest in the purchase. There is no testimony from which this court can find that Hammond had any connection with the sale other than that, after Mrs. Phelps had submitted the offer to Mrs. Hammond, he expressed to his wife, at her request, the opinion that it was a good price, but that she should use her own discretion in making a sale.

Nothing remains by way of complaint on the score of the method of sale, except the proof that the property was not advertised for sale in any public manner; that real estate experts were neither consulted in advance of the sale nor were they given the property to sell; and that the sale was private, instead of public, and for cash, instead of on credit terms. It is not intimated that there was any wrongful intent in any of these omissions, or any purpose to chill the sale. All that can be charged is a possible mere error of judgment, which alone is not a sufficient ground on which a sale may be set aside when made by a conventional trustee

within the power conferred by the instrument under which he acts.

A testamentary or other conventional trustee must be distinguished from a judicial trustee, who is the officer of a chancery court and whose acts are generally limited and defined by familiar and settled rules and procedure. *Paper Bag Co. v. Carr,* 116 Md. 541, 543, 544; *Williams v. Fidelity & Deposit Co.,* 121 Md. 222; *Whitelock v. Dorsey,* 121 Md. 497, 503. On the other hand, the trustee to whom land has been devised in trust with a power to sell derives his appointment and his power from the testator by virtue of the will, and so he may sell without the sanction of the court, and his discretion in the manner of sale will not be controlled, except in the event of its clear abuse or of bad faith, resulting in injury to the trust estate. A private sale may, therefore, be made by a conventional trustee without the counsel or aid of real estate agents, and without prior advertisement, and for cash, provided it is neither in violation of the terms of the trust nor made in bad faith or for a grossly inadequate price. 2 *Perry on Trusts,* secs. 770, 779, 783, 786, 786 a; *McLaughlin v. Fleming,* 124 Md. 28, 36, 37; *American Colonization Society's Case,* 132 Md. 524; 531; *Preston v. Safe Deposit & Trust Co.,* 116 Md. 211, 218; *Baer v. Kahn,* 131 Md. 17, 26, 27; *Gottschalk v. Mercantile Trust Co.,* 102 Md. 526; *Gould v. Chappel,* 42 Md. 466, 471, 473.

The position of a conventional trustee over whose trust the court has not assumed jurisdiction is that he is the special agent (trustee) of the creator of the trust, with the power to exercise his own discretion according to the nature of the estate granted and within the scope of the power conferred, while a trustee under a decree is an officer or arm of the court. To interfere with the exercise of the discretion of a trustee while acting in good faith would be to defeat the intention of the creator of the trust by substituting the discretion of the court for that of the trustee. But if the court for any reason should assume jurisdiction of the trust, the

situation of the conventional trustees "is thereby so far changed that they must thereafter secure the sanction or ratification of the supervising court for the successive steps of their administration of the trust. " *Baer v. Kahn,* 131 Md. 17, 25.

It may be stated as a result of the authorities and cases that the trustee under a decree has his functions prescribed and limited from time to time by law and by the orders and decrees of the court appointing him, and, therefore he must as a rule comply in every essential respect with all the modal regulations of equity and offer the property "in such a manner as to bring its fair market value, and to exercise the prudence that a careful owner would exercise in the sale of his own property." A conventional trustee, on the other hand, who is proceeding without the assumption of jurisdiction by the court, is not affected by the regulations of the mode of sale in chancery, but he is bound, in the effort to secure the fair market value of the property, to employ that degree of care which a reasonably prudent man would exhibit in the conduct of a similar sale. *Miller's Equity,* secs. 493, 495, 488. If a sale should be made by a conventional trustee in good faith and according to his best judgment, the sale will not be set aside unless there exists an inadequacy of price that, under the circumstances, is directly attributable to some failure of reasonable diligence or effort in the making of the sale.

2.   The price was $25,000 in cash on delivery of possession of the property. The farm was bought on August 13th, 1923, and the testimony is that the contract was so drawn because there was a tenant in possession, who required six months' notice prior to the end of the year of his tenancy before he could be ejected. The power of the tenant to keep the purchaser out of his possession of the property for such a long period was an important factor in determining the value of the property for development purposes. The brother, Benjamin Franklin Mewshaw, the life beneficiary, and Ritta Frances Hammond, one of the trustees, with a one-third in-

terest in remainder, were both satisfied with the sale.  Even
Annie Eleanor Phelps, the other trustee, with a one-third
interest in remainder, who was the active negotiator of the
sale, and who was satisfied with the bargain until a few days
after it was made, testified "if it were mine, I should say let
it go through, but being it is the other fellow's I think you
ought to study the best interest of him as well as your own
and get the best possible price for it."  The only other party
in interest is James Clinton Mewshaw, who holds the other
one-third in remainder.  It was he who filed the bill of com-
plaint.  He is engaged in real estate development in the
neighborhood of the property in question, and was qualified
to speak in support of his charge that the price was inade-
quate, but he did not testify.  His failure to take the witness
stand in denial gave verity to the statement in the answer
and the testimony of Kramme that he and Mewshaw had dis-
cussed the value of the property for a land development
project and had agreed that it was worth from $25,000 to
$30,000.

Mrs. Phelps testified that she really did not know the value
of the farm, but she asked $30,000 and agreed on $25,000 in
cash, without commissions, so that the price was equivalent
to $26,315.78.  The only witnesses for the complainant to
put a valuation on the property were two competent real
estate agents of Baltimore, who both testified that it was
worth $35,000 flat on August 13th, 1923, and who said they
would buy it for $35,000, subject to a brokerage of five per
cent., pay $2,500 in cash, $7,500 in ninety days, and give
a mortgage for $25,000 at one year.  The one said he was
willing to hold their joint offer open for thirty days, and the
other for any reasonable time necessary for the trustees or the
court to be in a position to transfer to them the property,
but as the offer was a joint one, it expired even before the
decree.  We do not believe this testimony is sufficient to
establish an inadequacy in price, because the comparison
must be between the purchase price and the fair market price.
The valuation ("worth") placed by these two experts on the

property on a day certain, or the price they would be willing to pay for their own business purpose, is not satisfactory evidence of a fair market value. Furthermore, this testimony does not take into consideration the effect on the market price of an existing tenancy, requiring a six months' notice to terminate. *Wilton v. Hall,* 25 L. J. Ch. 156.

It was contended by the appellee that Kramme had been offered fifty thousand dollars for the property since he bought it, but we believe that the correct reading of the evidence is that the witness, Fletcher Moore, presented, in rather a casual way, a suggestion that, if Kramme would associate himself with Moore, who was experienced in developing property for sale in lots, Moore would assure him a return of $50,000 at the end of four years, and be satisfied with all that was made in excess of that sum as his share in the joint enterprise. We are not convinced that such a speculative effort to calculate conjectural profits at the end of a remote period affords any safe foundation for fixing a present market value. *Horner v. Beasley,* 105 Md. 193, 197.

The burden of proof was on the complainant, but he did not produce any further testimony in support of his charge that the price obtained was inadequate. On the other hand, the evidence of John K. Culver, a real estate agent engaged for twenty-five years in the development of tracts of land into building lots, who has a development in the immediate neighborhood of the farm in question, and who well knew the property, was that its fair market value at the time of sale, without reference to the tenancy, was $500 an acre, or $28,000. The acceptance of $25,000 as an adequate price by Herbert Hammond and his wife, Ritta Frances Hammond, was based on a thorough knowledge of the property sold, and familiarity with neighborhood sales. Mr. Hammond had the additional qualification of being an auctioneer **and in the** real estate business.

While a private sale, without public advertisement, does not require the same degree of inadequacy of price and of a reasonable expectation that a re-sale will produce a better

result as are necessary to defeat a sale by public auction, yet both an inadequacy of price and a justifiable expectation of securing a higher price must co-exist before a court will set aside a contract of private sale made in good faith by a conventional trustee in the exercise of a discretion which was incident to an express power of sale. *Weinstein v. Boyd*, 136 Md. 227, 234; *Baer v. Kahn*, 131 Md. 17, 26, 27 and *supra*.

In the selection of the method of sale, the trustees were dealing with a property whose greatest value was in its adaptability to being laid off into small lots for residential purposes; but this was a special value whose capitalization in a sale depended upon securing a buyer from the limited class of purchasers who were engaged in a form of land development, which required a large capital outlay throughout an extended period of development and a peculiar ability. It is evident from the testimony that the trustees knew the nature of the property, and the difficulty of making a sale, which, while highly desirable, was not compulsory. There is evidence on the record from which it may be inferred that they had not sold because their estimate of the value of the land had been too great. The trustees could only sell the property as it was, and to offer the tract at a public auction might, under the circumstances, have been bad judgment, but the choice was committed to their discretion by the testatrix, who best knew their capacity. A private sale is a common method of disposing of real estate when time is not a controlling element; and it is frequently resorted to by the shrewdest of land owners. By that portion of Kramme's testimony, which was given on the part of the complainant and which was not denied, it was established that he had had the property for private sale as a real estate agent, through the consent of Mrs. Phelps, and that it was after he had failed in enlisting the interest of those whom he had solicited to buy, that he made his own successful attempt.

The testimony on this record, in the opinion of the court, falls far short of establishing either that the manner of mak-

ing the sale, under all the circumstances, was imprudent or
other than a provident owner would reasonably have em-
ployed in the sale of his own similar property under like con-
ditions; or that the farm was sold for such an inadequate
price as would justify the interference of a court of equity.
When the allegations of the bill of complaint, the absence of
either charge or proof of any form of fraud, and the signifi-
cant attitude of the parties in interest towards the sale and
the attack upon it are given their due weight in the consid-
eration of the testimony, the court is constrained to the con-
clusion that there is no sufficient ground shown to refuse to
ratify the sale. *Vollum v. Beall,* 117 Md. 617, 620; *Boyd
v. Smith,* 127 Md. 359, 364, 365; *Hunter v. Highland Land
Co.,* 123 Md. 644; 645, 650; *Edgecombe Park Co. v. Finney,*
121 Md. 320, 324, 327; *Evans Marble Co. v. Abrams,* 131
Md. 204, 206; *Bank v. Lanahan,* 45 Md. 396, 411.

3.   If both trustees had appealed, we should have no diffi-
culty in entertaining the appeal, since they are vested with
the legal title to the property which they hold under an active
and continuing trust for the benefit of a life tenant and the
remaindermen, and any decree which would materially affect
the amount or control of the estate thus held, or the rights
and interests of the beneficiaries so represented, would give
them jointly a right of appeal. *Balto. Trust Co. v. Corn
Products Co.,* 140 Md. 557, 559, 560; *Warehime v. Graf,* 83
Md. 98, 100, 101; *Miller's Equity,* sec. 356.

While it appears from the record that the trustees are two
of the three remaindermen, and so each has a substantial and
similar interest in the trust estate, yet both are parties to the
proceedings in their representative capacity and not indi-
vidually. If the co-trustee, Mrs. Hammond, were a party in
her individual capacity, as well as in her representative
capacity as a co-trustee, it might be held, under *Baltimore
Trust Company v. Corn Products Company,* 140 Md. 557,
559, 560, that she had taken the appeal in the capacity in
which she had the right to appeal. See *Lurman v. Hubner,*
75 Md. 268, 274. As this is not her situation on the record,

the appeal must be considered as in her representative capacity and the decision in *Donovan v. Miller,* 137 Md. 555, controls. In that case this Court decided that one of two conventional trustees could not prosecute an appeal, on the ground that trustees have equal power, interest and authority, and so cannot act separately. Inasmuch as her co-trustee did not unite in her appeal, it will be dismissed.

The effect of the dismissal of the appeal of Mrs. Hammond, trustee, will result in an affirmance of the decree below to the extent of the assumption of jurisdiction by the court over the trust created by the will of Ann Eliza Mewshaw.

Through an inadvertance in the preparation of the decree, the draftsman left out the penalty of the bond, which we note in order that this defect may be remedied on the remand of this cause. Code, art. 16, sec, 250; *Coudon v. Updegraf,* 117 Md. 75.

Our conclusion will render it unnecessary to consider the points raised on the pleadings, but requires a reversal of the decree to the extent it affects the sale to the appellant, John Kramme, and an affirmance of the decree in its assumption of jurisdiction over the trust created by the second section of the will of Ann Eliza Mewshaw; and the remanding of the cause for the passage of a decree conforming to this opinion.

> *Decree affirmed in part and reversed in part, and cause remanded in order that a decree may be passed in accordance with this opinion, the costs to be paid out of the trust funds in the cause.*