HOWARD LaMOTTE SHIPLEY ET AL. *v.*
RALPH M. CROUSE, JR. ET AL.

[No. 136, September Term, 1976.]

*Decided March 9, 1977.*

614

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Charles O. Fisher, Jr.,* and *Charles O. Fisher,* with whom were *Walsh, Fisher & Gilmore* on the brief, for appellants.

*Edward Pierson,* with whom were *Pierson & Pierson* on the brief, for Ralph M. Crouse, Jr. etc. et al., part of appellees. *William B. Dulany,* with whom were *Jeffrey D. Scott* and *Dulaney & Davis* on the brief, for Margaret L. Shipley, other appellee.

SINGLEY, J., delivered the opinion of the Court.

This is an appeal from an order of the Circuit Court of Baltimore City, which in the first instance dismissed a bill of complaint filed by Howard LaMotte Shipley, Georgia Shipley Hoff and Sandra Shipley Jones, the children (the Children) of H. LaMotte Shipley (Mr. Shipley), which had sought (i) the removal of Ralph M. Crouse, Jr. and The Equitable Trust Company (the Trustees) as trustees of a trust estate created by Mr. Shipley; (ii) an injunction

prohibiting the sale of certain assets of Mr. Shipley's trust, and . . . (iii) an accounting and damages.[1]

The second part of the order granted the relief prayed in an action brought in the same court by the Trustees against the Children and Mr. Shipley's widow, Margaret L. Shipley (Mrs. Shipley). The relief sought in this case was (i) the assumption of jurisdiction over the trust for the purpose of considering a contract for the sale of certain assets of the trust estate; (ii) the requirement that the respondents show cause why the contract should not be ratified and approved, and (iii) a consolidation of the cases. The cases were consolidated for trial, and after the entry of the orders, an appeal was noted to the Court of Special Appeals. We granted certiorari before the matter was heard by that court.

Mr. Shipley had died domiciled in Baltimore County, Maryland on 15 May 1969, survived by Mrs. Shipley and the three Children. On 9 March 1960, he had executed a revocable deed of trust, of which he and Ralph M. Crouse, Jr.[2] were trustees. At the inception of the trust, the trust assets consisted of 494 shares of the capital stock of Shipley Transfer, Inc.; 320 shares of Marva Trucking, Inc.; 10 shares of Shipley of Virginia, Incorporated (the Shipley Companies); policies of insurance on Mr. Shipley's life in a face amount of $125,000.00, and accidental death policies of $15,000.00. Prior to his death, $3,000.00 of the life policies seem to have been withdrawn from the trust. Subsequent to Mr. Shipley's death, the trust purchased from his estate the shares of Shipley of Pennsylvania, Inc., which had been owned by him.

The provisions of the trust agreement pertinent to the issues before us can be briefly summarized. Mr. Shipley reserved to himself the right to modify or revoke the trust

---

1. Mrs. Margaret L. Shipley, the widow of Howard LaMotte Shipley, had been permitted to intervene in this case, and after it had been consolidated with the second case, as a respondent.

2. Mr. Crouse had been a long-time friend and adviser of Mr. Shipley. At the time of the execution of the trust agreement, he was an employee of the Shipley Companies; at the time of Mr. Shipley's death, he was not.

agreement; to withdraw assets from the trust estate, and to add assets during his lifetime or by the terms of his will. Upon the death of Mr. Shipley, the trust would become irrevocable, and The Equitable Trust Company would succeed Mr. Shipley as co-trustee. On the death or resignation of Mr. Crouse, Mr. Shipley's son, Howard LaMotte Shipley, would succeed Mr. Crouse as individual co-trustee.

Income was to be paid to Mr. Shipley for life. Upon his death, the entire net income was to be paid to Mrs. Shipley, together with such sums from the principal of the trust as the Trustees might deem advisable to meet the exigencies of any emergency. On the death of Mrs. Shipley, the principal of the trust was to be equally divided among the children of Mr. Shipley, the descendants of any deceased child to take the parent's share, subject, however, to the provision that the share of any child who had not attained age 35 would continue to be held in trust until the child reached that age.

The Trustees were vested with broad discretionary powers, including the power to retain the assets which comprised the principal of the trust estate, and to purchase any asset from Mr. Shipley's estate, without liability for any loss incurred as a result of such retention or purchase.[3] There were two further provisions, which we quote because of their significance:

"SIXTH: * * * *

"V. No individual acting as Trustee hereunder shall be disqualified, because of his fiduciary

---

**3.** Paragraph SEVENTH vested the Trustees with additional powers as regards the stock of the Shipley Companies:

"To the end that the trust or trusts administered hereunder may have maximum flexibility in administration and be given maximum protection, I direct that the Trustee, in its sole and absolute discretion, shall have full power and authority to vote the stock of the aforesaid corporations and the stock of any other close corporation held in trust hereunder, and the Trustee is empowered to retain any such stock so long as it deems such stock, in its sole judgment, to be a proper asset to be held in trust (even though such stock may be an unsuitable investment under state law), or to sell or to dispose of any part or all of such stock, whenever the Trustee deems it advisable to do so, under such terms and conditions and in such manner as to the Trustee shall seem proper and advisable under the circumstances existing at the time."

relationship, from serving and from receiving reasonable compensation for his services as an officer and/or director (or in otherwise taking an active part in the management and operation of the business) of any corporation the stock of which, in whole or in part, is held in trust hereunder."

\* \* \*

"TWELFTH: No individual or corporation acting as a Trustee under this Agreement shall at any time be held liable for mistake of law or of fact, or of both law and fact, or errors of judgment, or for any loss coming to the trust or trusts or to any beneficiary hereunder, or to any other person, except through actual fraud or willful misconduct on the part of the Trustee to be charged. If this provision should be held invalid as to any class of persons or instances, such fact shall not impair its application to all other classes of persons and instances." [4]

The Shipley Companies were engaged in the interstate and intrastate transportation of bulk cargoes (cement, latex, petroleum products, and dry chemicals) by truck. At the time of Mr..Shipley's death, the stocks of the companies, which comprised the bulk of the assets of the trust estate, had been valued for Federal Estate Tax purposes at about $364,000.00. At time of trial, the assets of the trust, in addition to the stock, consisted of a mortgage on Mrs. Shipley's residence and approximately $25,000.00 invested in The Equitable Trust Company's common trust fund, remaining after discretionary payments of $15,000.00 from principal to Mrs. Shipley from July of 1975 through January of 1976.

---

4. Because of the view we take of this case, we should not be understood as passing upon the effect of this provision. *See,* however, Sullivan v. Mosner, 266 Md. 479, 494-99, 295 A. 2d 482, 490-92 (1972); Restatement (Second) of Trusts § 222 at 516 (1959); 3 A. Scott, Law of Trusts § 222 at 1771-73 (3d ed. 1967).

Consolidated net profit, after income taxes for the Shipley Companies, was as follows:

| | | |
|------|----------------|--------|
| 1970 | ($151,876.81)  | loss   |
| 1971 | $103,159.08    |        |
| 1972 | $85,377.28     |        |
| 1973 | $99,450.07     |        |
| 1974 | ($233,533.15)  | loss [5] |
| 1975 | $134,131.24    |        |

During the same six-year period, Mrs. Shipley's income ranged from $7,040.00 to $35,100.00 per year, aggregating $136,946.00 [6] for an annual average of $22,824.33.

From the outset, the Trustees were faced with the classic dilemma not infrequently faced by trustees: that of administering a trust which held virtually only one asset, the stock of a group of companies with fluctuating earnings records, which were perennially short of cash.[7] It was to the dividends from these Shipley Companies that Mrs. Shipley, the primary object of Mr. Shipley's bounty, looked for support. On the other hand, the desire of the Children for capital appreciation could not be reconciled with their mother's need for income. *See*, for example, *Maryland Nat'l Bank v. Merson*, 249 Md. 353, 239 A. 2d 905 (1968) as to the duty of impartiality as between successive beneficiaries; Restatement (Second) of Trusts, *supra*, § 232 at 555; 3 A. Scott, Law of Trusts § 232 at 1894-97 (3d ed. 1967).

The dilemma is somewhat reminiscent of that faced by our predecessors in *York v. Maryland Trust Co.*, 149 Md. 608, 131 A. 829 (1926). There, Roy F. York, a grandson of Lamon Harkness, left in trust a net estate of about $600,000.00

---

5. Of this amount, $120,000.00 represented an advance or loan of that amount to Mr. Shipley which was outstanding at the time of his death. It was finally written off as uncollectible because his testamentary estate was insolvent.

6. Included in this total was a salary of $7,500.00 paid by the Shipley Companies in 1970 and advances of $13,500.00 in 1971 and of $20,500.00 in 1972, also made by the Shipley Companies.

7. In fact, at 31 December 1974, the Shipley Companies had a negative current ratio.

invested almost entirely in stock of the several Standard Oil companies, which he had inherited from his grandfather, which produced a yield of $3^1/2$% or about $19,000.00, most of which was payable to his widow. On her death, the principal of the trust became payable to York's brothers and sister and their issue.

The will contained a provision that ". . . it is my wish that the stocks . . . [in the Standard Oil companies] be retained by my trustees so far as it is reasonably possible so to do." When the Atlantic Refining Company suspended dividend payments, Mrs. York sought to require the sale of the stock and the reinvestment of the proceeds.

Our predecessors, speaking through Judge Offutt, said:

> "The whole question, therefore, comes to this: Should the court, upon the facts of this case, require the trustee to dispose of securities which are safe, but which yield a low current return, and invest the proceeds in others which will yield a higher current return, but which may not be as safe, or in securities having the same margin of safety, which are likely to yield a higher current income, but a lower ultimate return, when the probability of future stock dividends is considered?
>
> "In dealing with that question some weight must be given to the wishes and the intention of the testator, as well as to the conflicting duties owed by the trustee to the life tenant and the remaindermen. In *Vickery v. Evans*, 33 Beav. 382, it was said: 'It is also quite clear that the plaintiff (the remainderman) cannot insist that the fund shall be invested at the smallest possible rate of interest, so as to increase the amount ultimately payable to him,' nor 'can the trustees, by fraud or collusion, so exercise their discretion as unduly to reduce the amount payable to the plaintiff' (the remainderman). *Ibid.* In this case the desire of the remaindermen to retain the investment in its present form, manifestly is induced by the

probability that the ultimate value of their respective shares will be increased by the declaration of stock dividends, and they are indifferent to the consideration that that increase be brought by keeping the current dividends below the rate which the earnings of the companies declaring them would justify. On the other hand, the life tenant is interested in securing the largest possible present income from the investments, and is not at all concerned in increasing the ultimate value of the shares which the remaindermen will receive. The testator was of course aware of that conflict in interest between the several objects of his bounty, as well as of the delicate nature of the discretion necessary to adjust it so as to fairly protect the interests of both the life tenant and the remaindermen, and with that knowledge he committed that discretion to the trustee in this case, and at the same time indicated to it the course he desired it to pursue. It is true that his directions are precatory rather than mandatory in character, but nevertheless they are sufficiently specific to warrant the trustee in taking them as its guide, if it can do so without manifest prejudice to the rights of any of the *cestuis que trust*, and we find it difficult to say that, in following the request of the testator in retaining stock owned by him at his death, that the trustee has abused the discretion reposed in it, upon the facts which we have stated. It is true that that part of the estate which is invested in the Atlantic Refining Company is at present wholly unproductive, since that company paid no dividends in 1925. But since it had regularly paid dividends for the nine preceding years, it cannot be said that because the trustee did not immediately dispose of its stock in that company when it failed to declare a dividend in 1925, that it acted arbitrarily or unwisely, in view of the fact that its present value is said to be greater than

when it was distributed, although we do not hold that it would be justified in retaining that investment for an unreasonable period of time if it continues to be unproductive, even though it be likely that it will ultimately declare a stock dividend sufficient to yield a fair average return for the unproductive period.

"Giving its legitimate value to the language of the will and the manifest intention of the testator, that the trustee should retain his Standard Oil Company investments as far as possible, for the purpose of increasing the value of the corpus of the estate, we have been unable to discover in this case anything which could justify the conclusion that the trustee has been guilty of bad faith or arbitrary conduct, or has failed to exercise reasonably sound judgment in retaining those investments." 149 Md. at 619-20

Concededly, the factual situation in *York* differs from that presented here, but the case is illustrative of the broad discretionary powers vested in a conventional trustee, *Webb & Knapp v. Hanover Bank*, 214 Md. 230, 242, 133 A. 2d 450, 456 (1957), which may be exercised absent evidence of bad faith, misconduct or a want of ordinary skill or judgment, *Kramme v. Mewshaw*, 147 Md. 535, 548, 128 A. 468, 473 (1925), *compare Fox v. Harris*, 141 Md. 495, 119 A. 256 (1922) and *Baer v. Kahn*, 131 Md. 17, 101 A. 596 (1917) *with Gilbert v. Kolb*, 85 Md. 627, 636, 37 A. 423, 424 (1897).

G. Bogert, The Law of Trusts and Trustees (2d ed. 1960) § 541 at 446, puts it this way:

"A trustee is required to manifest in all his management of the trust the care, skill, prudence, and diligence of an ordinarily prudent man engaged in similar business affairs and with objectives similar to those of the trust in question.

"A trustee with a duty to provide an income for a widow for her life, and to conserve the capital for

children until they reach 21, should use the same care that a husband and father would normally take in investing and managing his own property to assure his family of an income during the lives of the parents and to conserve the principal for distribution to the children at their maturities." (at 449)

The record shows that as early as June of 1969, immediately following Mr. Shipley's death, consideration had been given to the sale of the Shipley Companies. On Mr. Shipley's death, Wilson Corroum, an employee of the Shipley Companies, was elected president. After the unsatisfactory operating results experienced in 1970, his resignation was requested; Corroum was given a year's severance pay, and Crouse was elected president in his stead. Under Crouse's presidency the Shipley Companies enjoyed satisfactory profits in 1971, 1972 and 1973.

On 15 January of 1975, Crouse resigned, was given six months' severance pay, the use of a car, and was succeeded as president by George B. Eckels, until then vice president. Crouse's proposal that he be permitted to seek a purchaser for the Shipley Companies on a commission basis was opposed by the Children, and was not pursued, but there is evidence that immediately following his resignation, Crouse devoted his efforts to finding a purchaser. The Equitable Trust Company, however, agreed to compensate him by paying him 25% of its commissions as trustee. Within a week of Crouse's resignation, he initiated the efforts which ultimately led to the contracts dated 21 November 1975 with O'Boyle Tank Lines, Inc. (O'Boyle), a Virginia corporation, similarly engaged in the business of an interstate and intrastate carrier.

Because the parties recognized that the agreement of purchase and sale would require the approval of the Interstate Commerce Commission (the I.C.C.) as to the interstate routes, and of state regulatory commissions as to the intrastate routes, the agreements took the form of a

management agreement [8] which would remain in effect until regulatory approval of the purchase and sale agreement could be obtained. The agreement of purchase and sale was to be effective when necessary approvals had been granted.

The salient features of the management agreement were that O'Boyle would assume responsibility for the management of the Shipley Companies on the first of the month following the grant of temporary approval by the regulatory authorities; would pay to the Trustees the sum of $4,500.00 per month; and would, in the event that permanent approval of the proposed transfer was not forthcoming, retain the profits derived from the operation of the Shipley Companies during the O'Boyle management, but return the Shipley Companies to the Trustees with a net worth equivalent to that which existed at the date of the assumption of management responsibilities by O'Boyle.

The agreement of purchase and sale, while necessarily more prolix, provided for the purchase of the stock of the Shipley Companies owned by the Trustees for $1,350,000.00, of which $33,750.00 would be paid in cash within 60 days of obtaining final regulatory approval. The balance of the purchase price was to be evidenced by a promissory note bearing interest at 6%, payable in 39 quarterly installments of $33,750.00 each. Provision was made for withdrawal by O'Boyle from the purchase contract or for the renegotiation of the agreement in the event that: judicial ratification was not obtained; regulatory approval was conditioned on modification of the agreement, or if operating authorities were canceled or disallowed by the regulatory authorities. Additionally, the agreement contains the representations and warranties customarily found in such agreements.

The attack mounted by the three Children on the order entered below is bifurcated.

---

8. We were told at argument that the management agreement had been approved by the Interstate Commerce Commission several days earlier.

(i)

The Children rely on Maryland Code (1974), Estates and Trusts Article § 15-112, which tracks the language of Maryland Rule V84:

"REMOVAL OF FIDUCIARY

"(a) *Grounds* (1) Mandatory grounds.
A court shall remove a fiduciary who has:
(i) * * *
(ii) * * *
(iii) Shown himself incapable, with or without fault to properly perform the duties of his office;
(iv) Breached his duty of good faith or loyalty in the management of property of the fiduciary estate.
(2) Discretionary grounds. A court may remove a fiduciary who has:
(i) * * *
(ii) * * *
(iii) Failed to perform any of his duties as fiduciary, or to competently administer the fiduciary estate."

To this, the Children would add the gloss of the duty of loyalty of a trustee to the beneficiaries, explicated in the cases and the texts, *see Madden v. Mercantile-Safe Deposit and Trust Co.*, 27 Md. App. 17, 29-30, 339 A. 2d 340, 348-49 (1975); 2 A. Scott, *supra*, § 170 at 1297-99; Restatement (Second) of Trusts, *supra*, § 170 at 364.

The crux of the Children's argument is that the Trustees were acting in their own self interest; that they had failed to keep the beneficiaries informed as regards the progress of their negotiations with O'Boyle, and that they had elevated the interests of Mrs. Shipley over those of the Children. We regard all of this as something less than the hostility evidenced in *Mangels v. Tippett*, 167 Md. 290, 299, 173 A. 191, 195 (1934), on which the Children rely.

There, the individual co-trustee, apparently without the knowledge or consent of the widow, who received the income from the residuary trust, had caused himself to be elected as secretary of the company, at a salary of $50.00 per week, and urged the sale of 1250 shares of the stock of the Mangels-Herold Company which had paid a dividend of $6,250.00 annually, to Mr. Herold, the other stockholder, for $105,000.00. There, the court declined to remove Mr. Tippett as trustee, but concluded that his election as a salaried employee involved an impermissible conflict.

While there is no doubt that in the ordinary case, beneficiaries are entitled to receive "complete and accurate information as to the administration of the trust" and "to know what the trust property is and how the Trustee has dealt with it," 2 A. Scott, *supra*, § 173 at 1406-08, this is not absolute, if the trustee renders periodic reports showing collection of income and disbursements, *Baer v. Kahn*, *supra*, 131 Md. at 28-29, 101 A. at 600, if the trustee is acting in good faith and is not abusing his discretionary powers.

We seriously doubt that when negotiations are undertaken as delicate as those with O'Boyle, the beneficiaries are entitled to anything more than a disclosure of the end product, if the trustees are clothed with a broad discretionary power, particularly when the remaindermen are accorded an opportunity to accept or reject the sale, and especially when they knew of and at one point favored the sale of the company. The rule is otherwise when there is a confidential relationship between buyer and seller, or there is an element of self dealing. In such a case, the duty of loyalty mandates a full and frank disclosure, *Gianakos v. Magiros*, 238 Md. 178, 185-86, 208 A. 2d 718, 722-23 (1965); *Schmidt v. Chambers*, 265 Md. 9, 288 A. 2d 356 (1972); *Mangels v. Tippett*, *supra*, 167 Md. at 297-98, 173 A. at 194; G. Bogert, *supra*, § 543 at 473 *ff*; Restatement (Second) of Trusts, *supra*, § 170 at 364; Clapp, *A Fiduciary's Duty of Loyalty*, 3 Md. L. Rev. 221, 227-28 (1939).

The Children also point to the fact that counsel who had initially represented them and Mrs. Shipley and continued

to represent Mrs. Shipley was retained by The Equitable Trust Company to assist in the negotiations with O'Boyle. The answer to this is that he was familiar with the Shipley Companies, experienced in I.C.C. procedure and regulations, and appears to have played no major role in the determination to sell the Shipley Companies.

The facts, as found by the chancellor (Cole, J.) in an oral opinion delivered at the end of all the testimony, underpin the conclusion which we reach:

> "The grounds, I will state again, are as follows: The mandatory grounds [under Rule V84 are to have] willfully misrepresented material facts leading to his appointment, or to other action by the Court in reference to the fiduciary estate. I am certain Mr. Fisher [counsel for the Children] would agree that is inapplicable here. Willfully disregarded an Order of Court. That too would be inapplicable. Shown himself incapable, with or without fault, to properly perform the duties of his office; breached his duty of good faith or loyalty in the management of the property of the fiduciary estate. I take it on these latter two grounds are what Mr. Fisher, on behalf of his clients, requests the Court to make a finding as to whether or not the Trustees should be removed.
>
> "Discretionary grounds are stated as follows in the Rule: Negligently failed to file a bond within the time required by Rule or Order of Court; negligently failed to obey an Order of Court, neither of which is applicable, and, third, failed to perform any of his duties as fiduciary or to competently administer the fiduciary estate.
>
> "The thrust, as I take it, of the argument and evidence produced by those supporting this action, is that Mr. Crouse and The Equitable Trust Company did not act in good faith, did not perform their duties with due diligence, and one of the grounds suggested in argument is that, indeed,

there has been a conspiracy between them to deny certain information to the remaindermen upon their request. I will take up this last situation first. In order to do so, I think the Court is constrained to look at the circumstances at the time there was a refusal. I don't think there is any question about the fact, from Mr. McKenney's [counsel for The Equitable Trust Company] testimony, that when a group of the remaindermen approached him at his offices and requested certain information that this information was denied. Mr. McKenney testified, and the real substance of his testimony was crystallized by the Court's question, when he said that he told the inquirers that he would advise them when a final contract had been consummated and when it was submitted for ratification. There was some dispute about whether or not that is what he said, in that the remaindermen had suggested that he had said that they would be kept abreast of the negotiations, that they would be told what was going on, in other words, during the course and before a final contract had been reached.

"Now, what had happened before this situation? It is clear to this Court that the remaindermen were not ignorant of an intended sale. It was no secret that the Trustees wanted to sell this company. It was no secret, as a matter of fact, that the remaindermen at one time had wanted a sale of the company because, I think it was in a letter — and I can't put my hands on the exhibit now. I have examined so many of these exhibits which you gentlemen have put in, but I think the evidence clearly supports my recollection that a letter was written to the Trustees indicating that such sale would not be generally publicized. There came to be a change in the attitude of the remaindermen. All of the parties apparently at this time were represented by counsel, but the change was that no sale was to be conducted unless a firm offer had

been submitted as of a certain date, and then there was some suggestion that the sale price should be two million or one million eight. Then the attitude was that there would be no sale, by the remaindermen. The Trustees clearly at this point had decided that a sale was in the best interests of the trust estate. It was clear also that the remaindermen did not want a sale. It is suggested that there are all kinds of reasons; that some of the Shipley family, I think Howard Shipley and Mr. Jones, who are employees of the company, would lose their jobs if the sale were conducted, but I don't believe this is really crystallized at this point because the contract itself had not been consummated; that is, in terms of a written document. In any event, the point that I am getting at is that from Mr. McKenney's testimony, from Mr. Crouse's testimony, and from the overall testimony given to me about what the circumstances were up to that time, there was the attitude on the part of the Trustees that in order to consummate a sale that they could not share all of the information with the remaindermen because the remaindermen were intent on thwarting a sale. Mr. Fisher, on behalf of his clients, says that in refusing to give this information to the remaindermen there was a breach of the fiduciary duty by the Trustees.

"The question is quite an interesting one, but the Court, in trying to decide the answer to this question, had to ask itself what was the first obligation of the Trustees, and it is clear that under all of the law the first obligation of the Trustees is to safeguard the trust estate, and in doing so they are called upon many times to exercise a judgment. The judgment which they exercised at this time was that they would share the final contract and let the beneficiaries know when it was submitted to the Court for ratification, but they would not share the step by step negotiations with the beneficiaries.

"The Court is of the opinion that the circumstances existing at that time warranted this course of action, and is not persuaded to accept the argument advanced by counsel that this was a breach of their duty, but, quite to the contrary, was in furtherance of their duty to try to do what, in their judgment, was in the best interests of the trust estate.

"It is also suggested that Mr. Crouse was being paid while he was trying to find a buyer, and this was a conflict. I asked the question before, Who is Mr. Crouse? Apparently, in the minds of the Business Advisory Committee [of The Equitable Trust Company] and the mind of Mr. Bond, he was the most knowledgeable man about, concerning the trucking business, and he also understood the Shipley group. He had run the company for a period of years, and then in a period of decline his resignation had been forced, more so than voluntarily submitted. The company saw fit to pay him six months' salary and allow him to use a car. This was not an altogether uncommon practice because, I think the testimony revealed, this had happened to a former president, [9] but the most significant thing about this is that all of the parties agreed; all of the interested parties, the widow and the beneficiaries, agreed. The Court finds this is not a conflict of interest as to in any way reflect upon the service which Mr. Crouse was offering to the trust estate."

We cannot say that the facts found by the court were clearly erroneous, Rule 886.

(ii)

The Children's second contention is that the trial court erred in ratifying the purchase agreement and the management agreement.

---

9. It will be recalled that the former president had received a year's severance pay.

This argument largely turns on the notion that an inadequate price was negotiated as a result of lack of diligence by the Trustees and that the acceptance of various provisions contained in the instruments constituted an abuse of discretion by the Trustees, relying on *Madden v. Mercantile-Safe Deposit and Trust Co., supra*, 27 Md. App. at 31.

The difficulty here is that in 1974 the Children had apparently agreed to a sale at from $1,500,000.00 to $1,800,000.00. In January, 1975, they were agreeable to a sale at from $1,500,000.00 to $2,000,000.00 but determined to oppose a sale at $1,350,000.00. They attempted to buttress their position by relying on minutes of the Business Interests Management Committee of The Equitable Trust Company (of which they had no knowledge at the time) which reflected that in 1973, it was thought that the Shipley Companies were worth $3,000,000.00 and in four or five years would be worth $5,000,000.00. As it turned out, O'Boyle appears to have been the only real prospect. Its original offer of $1,025,000.00 in February, 1975 was ultimately negotiated upward to $1,350,000.00 in mid-1975.

At trial, the Children produced two witnesses: Hal C. Hendrix, the treasurer of the Shipley Companies, who valued the Shipley Companies at $1,035,721.00 to which should be added the value of the operating rights, and the somewhat nebulous testimony of Charles E. Creager, an attorney with an extensive I.C.C. practice, who valued the Shipley Companies at from $2,064,638.00 to $2,476,000.00. Two others were produced by the Trustees, William M. Legg, a trucking industry analyst with the Baltimore brokerage firm of Alex. Brown & Sons, who placed a value of between $900,077.00 and $1,050,000.00 on the Shipley Companies, and Eugene T. Liipfert, a Washington attorney, who had valued similar companies for buyers, but had never testified as an expert. He valued the Shipley Companies at between $1,205,890.00 and $1,380,800.00 and added, "To get a price of one million three fifty whoever worked that trade was a pretty good horse trader on the sellers' side."

In reviewing the expert testimony, the chancellor found:

"The final question then arises as to whether or not this sale should be ratified. The issue which the beneficiaries have advanced is that the purchase price is inadequate and that the purchase agreement does not protect the trust estate.

"In this regard, the parties have offered expert testimony. Expert testimony is important in any case, particularly one involving value, but the testimony of an expert is no better than the reasons given to undergird it. The testimony of Mr. Creager was diluted to some extent because of the errors in calculation and because of the repeated statement that these were matters of judgment, with nothing more to support it. The Court was impressed with the testimony of Mr. Liipfert, and the Court feels that the formula advanced by him in computing the value was a sound one. The Trustees, I might say, knew that the assets here at the time the grantor died were valued at about three hundred fifty thousand dollars. They knew that the business had demonstrated instability over a period of years. They knew that the business had not shown any real growth. They also knew that, as a trust asset, the trucking business was risky and undesirable.

"The Court is convinced that throughout their negotiations they exercised due diligence, that they were aware of the value of the equipment they had, and had placed a value on the other assets of the Shipley group. The fact that they reached the price of one million three hundred fifty thousand dollars as being adequate is undergirded by the testimony of Mr. Liipfert."

Since we are satisfied that the right result was reached by the trial court, we shall affirm that court's order. In view of the result which we adopt we shall deny the motion of the appellees to dismiss the appeal on the ground that the record

632

extract fails to comply with Rule 828, because the result which we reach will require the appellants to pay the costs incurred by the appellees in supplementing the record extract.

*Order affirmed; costs to be paid by appellants.*