76 A.3d 422

**Stephen J. MILLER, et al.**

v.

**ROSEWICK ROAD DEVELOPMENT, LLC, et al.**

**No. 1093, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Sept. 25, 2013.

276

Robert C. Park, Jr. (Linowes and Blocher, LLP, on the brief) Bethesda, MD, for appellant.

Louis P. Jenkins, Jr., La Plata, MD, for appellee.

Panel: KRAUSER, C.J., KEHOE and JAMES P. SALMON (Retired, Specially Assigned), JJ.

KRAUSER, C.J.

On December 14, 1998, appellants—Stephen J. Miller, Mary Ebner, and Francis Lee Moreland—were appointed, by the Circuit Court for Charles County, as trustees of the Frank E. Connell Trust, under the terms of a consent order entered by that court. The trust's principal asset was an undeveloped parcel of real property in Charles County. Among other things, the consent order directed the trustees (appellants) to sell the property and liquidate the trust, by distributing the

proceeds from that sale to the trust's beneficiaries, "as soon as said sale and liquidation may be prudently completed."

Appellants encountered lengthy delays in completing that sale and liquidation, and, in 2010, Rosewick Road Development, LLC, one of the appellees, having acquired the interests of a number of trust beneficiaries, filed a motion in the Charles County circuit court, seeking removal of appellants as trustees and appointment of a successor trustee, who would "fulfill the express purpose" of the consent order by selling the property and liquidating the trust. This motion was supported by a number of beneficiaries, representing, collectively, nearly an eleven percent interest in the trust and who are parties to this appeal as appellees.

Although appellants opposed the motion, the circuit court, after several hearings, granted Rosewick Road's request and issued an order removing appellants as trustees and thereafter appointed a new trustee. Upon their removal as trustees, appellants noted this appeal, raising four issues, which are reducible to three. They are:

1. Whether Rosewick Road Development had standing to seek removal of the trustees, appointed under terms of a consent order to which its assignors had previously agreed;

2. Whether the circuit court exceeded its legal authority, either in unilaterally changing the terms of the consent order or in applying an incorrect legal standard, under Estates and Trusts Article § 15–112, in removing the trustees; and

3. Whether the circuit court committed clear error in removing the trustees in the absence of evidence that they had been derelict in the performance of their duties.

We hold that, notwithstanding appellants' claim to the contrary, Rosewick Road had standing to seek the removal of the trustees and that the circuit court had legal authority to remove appellants as trustees. We further hold that, although the court below neither unilaterally changed the terms of the

consent order nor applied an incorrect legal standard, as appellants claim, it nonetheless erred in removing appellants as trustees. Consequently, we shall vacate the order of the circuit court and remand with instructions to reinstate appellants as trustees.

## Background

In 1937, Frank E. Connell purchased, in his sole name, a farm just outside of La Plata, Maryland. According to the deed, it was, at that time, believed to be, "by estimation, four hundred and sixty-five (465) acres more or less." Thirty years later, he died. At the time of his death, he was married to Rose L. Connell. She received, under the terms of his handwritten will, the use of all of his property and assets, including the property at issue, for the remainder of her life, and, upon her death, his "remaining property and assets" were to be "divided equally among her relatives and [his]."

In May 1977, Rose Connell died. Thereafter, the executors of the estates of Mr. and Mrs. Connell sought to sell the property. They soon learned, however, that there were no buyers, as the property had been "extensively" mined for gravel, and, pursuant to a lease then in effect, mining operations were still ongoing. Those operations eventually ended in 1994, upon the expiration of the gravel mining lease.

But, then, a dispute arose among the beneficiaries of the respective estates of Mr. and Mrs. Connell, because it was unclear which of the two estates owned the tract of land at issue and because the beneficiaries could not agree on an appropriate disposition of that property. Some of the beneficiaries wanted to operate it as a farm; others wanted to lease it for gravel and pulpwood extraction; and still others wished to sell it. Ultimately, the beneficiaries resolved their dispute, and the resultant settlement agreement was memorialized in a consent order, which was issued by the Charles County circuit court on December 14, 1998.

That order provided that the will of Frank E. Connell be "hereby interpreted as establishing a trust," containing the

property at issue. The stated purpose of the trust was to "hold the Real Property and assets previously or subsequently derived therefrom as a liquidating trust for sale with assets to be distributed to the beneficiaries in accordance with their interests as soon as said sale and liquidation may be prudently completed." The consent order vested legal title in that property "solely and absolutely" in the trustees, whose appointment was provided for elsewhere in that document. It further declared that the trust "shall have three trustees ..., who shall act together by consensus" but that, should it become impossible to reach a consensus, any two trustees "together shall have the authority to act" on behalf of the trust.

The consent order named, as trustees, appellants: Francis Lee Moreland, Jr.; Stephen Miller; and Mary Ebner. Their appointment reflected, as Miller would later testify, a compromise among the various factions: Moreland was a relative of Rose Connell as well as a licensed real estate agent in Maryland; Miller was a relative of Frank Connell as well as an attorney; and Ebner was purportedly a "neutral party." Under the terms of the consent order, replacement trustees "may only be appointed by" court order "upon recommendation of the Trustees" themselves, "after notice to the beneficiaries and an opportunity to be heard."

Pending final sale of the real property and distribution of the proceeds, the trustees were granted authority to "create, increase, maintain, invest and reinvest reasonable reserves" from the liquid assets of the trust. They were further authorized to mortgage or encumber the real property "to facilitate a sale of one or more parcels" but could not, without prior court approval, mortgage or encumber it for development. Once the real property was sold, the trustees were required to distribute the proceeds to the beneficiaries in proportion to their interests and to dissolve the trust.

The consent order also authorized the trustees to "do all things necessary or helpful to effect the sale of" the property "in a single transaction or in a number of transactions." "For

purposes of sale," the trustees could, "in their discretion, among other things, accept such arrangements for purchaser inspection, independent testing, governmental commitments, approvals and consents as may be customary or appropriate in marketing properties of similar size and condition in the greater Washington–Baltimore Metropolitan area."

As for the timing of the sale of the property and its sale price, the consent order provided:

> The Trustees may enter into a sales contract for the entire parcel of Real Property, subject to court approval, at 85% or more of the appraised value of the entire parcel, at any time within 36 months of the date of this consent decree. Subsequently, the Trustees may enter into a sales contract, for the entire parcel of Real Property, subject to court approval, in any amount. Sales of less than the entire parcel of Real Property at any time shall also require court approval, but are not subject to the 85% limitation noted above.

A total of fifty-five trust beneficiaries were listed in the consent order, with interests ranging from 1.19 percent to, in one instance, 7.14 percent. Their interests were, stated the order, "freely transferable" and, "consistent with Maryland law, each trust beneficiary" could "sell, transfer during life or upon death, donate or take any other lawful action regarding ownership of trust interests."

Upon their appointment as trustees, appellants learned that the property was a "large," "undeveloped," and "irregularly shaped parcel" of "undetermined" size. Indeed, though the 1937 deed purported to convey four hundred sixty-five acres, "more or less," subsequent surveys of the property estimated its size as somewhat less than that.[1] In addition to the

---

1. Rosewick Road's initial pleading in this matter asserted that the property was only four hundred thirty-five acres, while the most recent survey, commissioned by appellants, concluded that it comprises four hundred twenty-five acres, though it is unclear whether some of that reduction in size may have resulted from a land swap appellants

potential problems presented by the gravel mining that had been carried on at the property, appellants faced at least two other problems: the property lacked water and sewer access and was landlocked. In fact, access to it could only be obtained via a poorly maintained, single-lane, gravel path.

At about the same time the consent order was entered into by the parties, appellants retained a law firm to advise them as to the appropriate course of action they should take in disposing of the property. They thereafter obtained the services of a local engineering firm to perform the following studies of the property: first, a boundary survey, to obtain a more reliable estimate of the property's size; second, geotechnical and wetlands studies, to assess the then-unknown impact of the decades-long gravel mining operations that had taken place on the property and to determine the impact "several areas of wetlands on the property" would have on both the property's use and value; third, a feasibility study, to identify both potential uses of and buyers for the property; and fourth, a marketing analysis, to identify potential problems with the property, so that appellants could either take measures to alleviate them (thereby increasing the value of the property) or, at least, know of them and thus be in a better position to market the property to potential buyers.

After the feasibility study was completed, appellants commissioned an appraisal of the property, as the consent order required them to do. That appraisal, which was the first of several that would ultimately be done, was completed in 2001 by Lipman Frizzell & Mitchell, LLC. That firm estimated that the property was then worth $3.275 million. But, as appellant Miller would later testify, it soon became "obvious," after consultations with the appraiser, that this appraisal "severe[ly] discount[ed]" the property's value, because the property then had neither highway access nor water and sewer service. That appraisal prompted appellants to begin discussions with town and county planning officials, to investigate the feasibili-

---

entered into, on behalf of the trust, with Charles County. The land swap is discussed in more detail later in this opinion.

ty of infrastructure improvements, including improved highway access as well as water and sewer hookup.

County officials informed appellants that an extension was planned for a nearby limited-access highway, the St. Charles Parkway, and that, if appellants would agree to a land swap, the county was willing to ensure that the highway would be routed along the southern boundary of the property and that it would include several interchanges, which would provide direct access to this tract. Those negotiations were successfully concluded in December 2005, and construction of the St. Charles Parkway extension commenced in 2006.

The county also informed appellants of another nearby road construction project, a planned extension of Radio Station Road across the property. The county suggested that, if appellants would agree to a land grant, to provide the necessary right-of-way, not only would the county build the road at its own expense, thereby further improving highway access to the property, but it might also approve the property for water and sewer hookup, though, as of the time this appeal was heard, water and sewer had not been provided.

Believing, in any event, that they had made significant strides in removing the major obstacles to marketing the property, appellants stepped up their promotion efforts. Appellants had, according to appellant Miller, attempted to sell the property "[r]ight from the beginning," by meeting with several potential buyers, including Facchina Construction Company, an affiliate of appellee Rosewick Road.[2] But, after construction of the St. Charles Parkway extension began in 2006, appellants experienced increased interest in the property.

Appellants distributed a "term sheet" to nine potential bidders, setting forth a minimum bid of $9 million, and three companies, including Facchina Construction, accepted the

---

2. Although it is unclear precisely how Facchina Construction and Rosewick Road are, as appellants have termed it, "affiliate[d]," Rosewick Road does not dispute that it is closely related to Facchina Construction.

term sheet. Appellants then offered each of the three "an opportunity to raise their bid above the minimum." Two of them did, but Facchina Construction did not, whereupon appellants selected KLM Real Estate Services, LLC, which had increased its bid to $10.5 million for the property.

Appellants' attorneys then drafted a formal sales contract, and, in November 2006, KLM and the trust executed that document. Consistent with standard industry practice, the contract included a due diligence period, of 120 days, during which the buyer had the right to withdraw its offer and terminate the contract. Unexpected problems in obtaining investor financing led KLM to do precisely that in March 2007.

Appellants then renewed their attempts to sell the property, and, in August 2007, they, on behalf of the trust, entered into a sales contract with TC Fund Property Acquisitions, Inc., a wholly owned subsidiary of a large national developer, Trammell Crow Company. This contract provided, as the previous contract did, for a purchase price of $10.5 million. It also included a due diligence clause, but reduced the due diligence period from 120 to 95 days. That period was later extended to 155 days in exchange for forfeiture, by TC Fund, of a portion of its deposit.

During its due diligence period, TC Fund commissioned a number of environmental, geotechnical, engineering, and marketing reports concerning the property, which, under the terms of the sales contract, were provided to the trust and were usable by it for its own purposes. Satisfied with the results of those reports, TC Fund, in late 2007, indicated to appellants its intention to proceed to closing. But, before it could do so, a nationwide financial crisis began, which, according to the uncontroverted testimony of appellants' commercial real estate expert, Harry Shasho, essentially froze commercial real estate activity in southern Maryland, because "[t]here was practically no financing available." The financial crisis led TC Fund to terminate its contract, telling appellants that they "could not commit their funds until they knew" the extent and depth of the then incipient economic downturn.

As the financial crisis unfolded, appellants, in the words of Miller, "tried [their] best to continue to sell" the property without success. During the next two years, they received two offers for the property, but at prices which were far below what they had obtained just a few months earlier. The first of those offers, which was made by an investor named "Berman" in 2008, was at what Berman himself termed "distress pricing," that is, a purchase price of $5 million. That offer was rejected. It was, as Miller put it, far below the $10.5 million which had been offered "just months before," and prudence dictated, appellants believed, that they should reject Berman's offer.

The second offer was made by Facchina Construction, an affiliate of appellee Rosewick Road Development, in late 2009, at an even lower price of $3.01 million. By that time, Rosewick Road had acquired a substantial stake [3] in the Frank E. Connell Trust. Facchina Construction's offer was based on an appraisal it had commissioned from James B. Hooper, P.A., a local appraiser. Hooper had concluded that the "as is" value of the property was $3.01 million and no more. Its offer was, however, only open for a period of fourteen days and then it was to expire if no response was received within that time period.

Appellants did not believe that the Hooper appraisal accurately reflected the market value of the property. Miller pointed out that, several years earlier, Facchina Construction had purchased property immediately south of the trust's property, paying eighty-two cents per square foot, whereas the Hooper appraisal estimated the trust property to be worth only sixteen cents per square foot, and that, as noted, was what Facchina Construction, in effect, offered. Citing the "uproar that [appellants] would have had from all of the

---

3. By the time Rosewick Road filed its motion to remove trustees, less than two months after tendering the late 2009 offer, it had acquired a 30.7% interest in the Frank E. Connell Trust, a stake obtained over the preceding eighteen-month period.

beneficiaries" had the trust property been sold at such a low price "to the same person who had paid eighty-two cents a square foot for property immediately south of [it]," appellants flatly rejected Facchina Construction's offer as, in Miller's words, "out of the question."

Throughout nearly this entire time period, there had been rumblings of discontent among some of the trust's beneficiaries, a faction principally composed of Mrs. Connell's family members, living in Hungary. All of them were, according to a motion they filed below, "elderly" and in "poor health" and, apparently for that reason, were "impatient" and wanted the property sold and the trust liquidated quickly. In March 2003, this group, whom we shall collectively refer to as the "Hungarian beneficiaries," held a combined interest in the trust exceeding nineteen percent, and they filed both a motion to intervene and, at the same time, a petition to remove appellants as trustees.

In both their motion to intervene and their petition to remove appellants as trustees, the Hungarian beneficiaries complained that appellants had failed to inform them of the financial status of the trust or otherwise communicate with them and had failed to file accountings as required by the Maryland Rules. Although their motion to intervene was granted, this 2003 petition to remove appellants as trustees was not.

Beginning sometime in 2008, approximately half of the Hungarian beneficiaries, along with some other beneficiaries, assigned their trust interests to Rosewick Road. By January 2010, Rosewick Road had acquired an undivided 30.7 percent interest in the trust.[4]

On January 19, 2010, appellee Rosewick Road filed, in the Charles County circuit court, a motion to remove appellants as

---

4. Apparently, Rosewick Road has been gradually acquiring an ever increasing interest in the trust. In a motion it filed, on the eve of the final hearing below in this case, Rosewick Road stated that it held an undivided 38.16 percent interest, making it "by far the largest individual beneficiary" of the trust.

trustees and "for other appropriate relief." The remaining Hungarian beneficiaries, collectively constituting a nearly eleven percent interest in the trust, filed a memorandum in support of Rosewick Road's motion to remove, and they, too, are appellees in this case.

The circuit court held three hearings to consider the matter. After the first hearing, in April 2010, the circuit court decided to take appellees' motion under advisement and scheduled a review hearing in November 2010. At the conclusion of the November hearing, the court stated that it was "inclined to grant" appellees' motion but that it would "give Mr. Miller the opportunity to get it done his way." It then scheduled the third and final hearing in the matter, which was held in June 2011.

At the final hearing in June, appellants called three witnesses: Jane Gatewood, an appraiser; Harry Shasho, a real estate broker with extensive experience in the southern Maryland commercial real estate market; and appellant Miller. Appellees presented no additional testimony or evidence.[5]

Mr. Shasho, accepted by the court as an expert in the field of commercial real estate brokerage, testified that appellants first consulted him in early 2007, to "find out what the market was" and to "get some ideas" as to what could be done with the property. Because, at that time, appellants "still had a contract on the property" with KLM, he and appellants did not enter into a formal listing agreement.

During the next three-and-one-half years, Shasho discussed with appellants local market conditions, recent land sale prices, marketing methods, and zoning issues, including the possibility of having the property re-zoned for mixed use development or having the property annexed by the Town of La Plata, as well as related issues of obtaining water and

---

5. Because we have no transcripts in the record of the April 2010 and November 2010 hearings, we do not know what was presented at those hearings other than any representations that have been made in the parties' briefs and memoranda filed during the proceedings below.

sewer access. He also provided appellants with a written estimate of net proceeds from a proposed sale of the property, based on a purchase price of $10 million.

Appellants and Shasho delayed entering into a listing agreement for several years, even after TC Fund's decision to withdraw from its sales contract, because, in Shasho's words, that time period was "one of the worst times" in history "to try to sell anything ... large," since "[t]here was practically no financing available." In fact, during that recessionary period, several "major" commercial development projects in southern Maryland simply "stopped," even though construction in those projects was far along. In Shasho's opinion, "it would have done [no] good" to heavily market the property during the 2007–2010 time period, because market conditions were so distressed that, if the property had been listed for sale, it likely would have remained unsold for an extended period, leading potential customers to regard such a listing as "a distress property," a result that would have destroyed the sellers' bargaining position.

In October 2010, appellants and Shasho, believing that the southern Maryland real estate market had bottomed out, entered into a listing agreement, shortly before the second hearing in this matter. The property was listed at an asking price of $10.95 million, a price Shasho recommended based upon his market analysis, which relied upon engineering studies and recent sales data, as well as his belief that the property could be re-zoned for mixed use development. To market the property, Shasho thereafter entered it into innumerable real estate listing databases; marketed it at a trade show in Las Vegas; contacted local real estate brokers and developers; and met with La Plata and Charles County officials to discuss the possibility of annexation, available public water and sewer service, and the possible extension of light rail and highway connections to the property. Nonetheless, he has been unable to sell the property, despite his view that there is nothing about the property that would prevent it from being sold in the "normal course" of an improving market.

As a result of their inability to sell the property, Shasho and appellants sought another appraisal. They turned to Jane Gatewood, who, as noted earlier, also testified at the June 2011 hearing.

Ms. Gatewood, an expert in the field of commercial real estate appraisal, said that appellants provided her with engineering and market analysis reports, prepared on behalf of TC Fund, during its due diligence period in 2007. She then described, in some detail, the technical methods she used in preparing her appraisal. Her appraisal stated that the property was worth $9.25 million, based on fifty cents per square foot. Asked about the methodology used by Mr. Hooper, the appraiser who had prepared the appraisal on behalf of Facchina Construction and had arrived at a much lower figure of $3.01 million, she opined that the Hooper appraisal was not "valid" because it was based upon "significant violations of approved appraisal practices."

The last of the three witnesses to testify on behalf of appellants was appellant Miller. In addition to setting forth, in detail, appellants' efforts to evaluate and then market the property, he testified that appellants and Mr. Shasho had agreed, based upon the Gatewood appraisal, to reduce the listing price for the property from $10.95 million to $9.5 million, which was still more than three times the Hooper appraised figure of $3.01 million. Ms. Gatewood's appraisal, according to Miller, was "conservative" and, in his view, "undervalued the property," but he agreed to nonetheless lower the property's asking price in accordance with her appraisal to $9.5 million.

The circuit court made two separate rulings at the June 2011 hearing, one prior to hearing testimony and one after doing so. First, it denied what it described as appellants' "motion to dismiss the motion to remove trustees," based upon the final sentence of paragraph 4 of the consent order, which, as noted earlier, provides that "[r]eplacement or successor trustees may only be appointed by" court order "upon recommendation of the Trustees" themselves, "after notice to the

beneficiaries and an opportunity to be heard." After observing that that language in the consent order is "ambiguous," as it seemed to imply that it overrode the fiduciary removal statute, Estates and Trusts Article, § 15–112, the circuit court stated that it would interpret that provision "in such a way as to be consistent" with the statute and, as a result, found that it had the authority to remove trustees, even without a recommendation of the trustees themselves.

Then, at the conclusion of the hearing, the circuit court granted appellees' motion to remove appellants as trustees. The court agreed with Rosewick Road that paragraph 6 of the consent order, which authorized the trustees to "enter into a sales contract for the entire parcel of Real Property, subject to court approval, at 85% or more of the appraised value of the entire parcel, at any time within 36 months of the date of this consent decree" but that thereafter permitted them to enter into such a contract, "subject to court approval, in any amount," was "very significant" and that, although not a strict time limitation, it suggested that the purpose of the consent order was, as the court put it, "get a good price, but get it sold." Then, citing appellant Miller's testimony that he would not accept a figure below nine million for the property, which it characterized as "basically full price," it concluded that, because appellants were "fixated" on "getting top price" for the property, they had "lost a sense of ... balance" in performing their duties. The circuit court therefore held that appellants "failed" to fulfill their fiduciary duty to sell the property "prudently," and it ordered that they be removed from their positions as trustees. That decision led appellants to note this appeal.[6]

## Discussion

### I.

■ Appellants maintain that Rosewick Road lacks standing in this matter for two reasons: First, they claim, the

---

6. Nine days after the notice of appeal was filed, the court denied appellants' motions for reconsideration and to stay enforcement of judgment, and it appointed a successor trustee.

beneficiaries, who assigned their trust interests to Rosewick Road, have no basis upon which to claim they are aggrieved by the consent order to which they were parties and, hence, have no right to appeal from it. And, from that conclusion, they reason that, since Rosewick Road, as an assignee, stands in the shoes of its assignors, it too has no right to appeal from the consent order. Second, they surmise that, because Rosewick Road did not begin to acquire its interest in the trust until 2008, it has no right to complain about any purported delay by appellants which took place before then. Neither of these two grounds provides a basis for us to conclude that Rosewick Road lacks standing in the matter before us.

█ Although "ordinarily, a party may not appeal from a judgment to which he/she consented," *Bryant v. Howard Cnty. Dept. of Soc. Servs. ex rel. Costley*, 387 Md. 30, 42, 874 A.2d 457 (2005), it may, nonetheless, seek a judicial remedy, by invoking the procedures set forth in Title 2 of the Maryland Rules, if there is a failure by any party to abide by the terms to which he or she had agreed. According to Maryland 2–631, judgments "may be enforced only as authorized by [the Maryland Rules] or by statute." As the consent order in this case provided for the establishment of a liquidating trust, the statute to which we turn is section 14–101 of the Estates and Trusts Article. That section provides that a "court having equity jurisdiction has general superintending power with respect to trusts." Md.Code (1974, 2011 Repl.Vol.), § 14–101 of the Estates & Trusts Article ("ET"). As appellees point out, such "superintending power would include the power to remove a fiduciary pursuant to" ET § 15–112.

Rosewick Road's motion to remove the trustees was an attempt to enforce the consent order in this case, not an appeal from the underlying order itself. Since the beneficiaries who assigned their interests to Rosewick Road had the right to enforce the consent order, so, too, did their assignee, Rosewick Road. Nor is Rosewick Road's right to enforce the consent order affected by the fact that appellants' purported failure to perform their duties occurred, in part, during the

period of time before the assignments to Rosewick Road were made, because the assignors retained their interests throughout that time period, and, under the express terms of the consent order, they could and did transfer their interests, including their rights of enforcement, to Rosewick Road. We therefore conclude that Rosewick Road has standing to seek removal of appellants as trustees for acts and omissions that predate the assignments and that it was entitled to do so by the means authorized by rule (Md. Rule 2–631) and statute (ET § 15–112).

## II.

Appellants contend that the circuit court "unilaterally and impermissibly changed the terms of" the consent order in three ways: First, it effectively imposed a deadline for the sale of the property, although the consent order itself contained no such deadline; second, it removed the trustees named in the consent order; and third, it appointed a new trustee, not named in the consent order, and, in so doing, failed to follow the provisions in the consent order for replacement or substitution of trustees. Finally, appellants claim that the circuit court "erred, as a matter of law," in applying ET § 15–112 to remove them as trustees. Because the gravamen of all four claims is appellants' contention that the circuit court lacked the power to act as it did, we shall consider them together.[7]

Largely for the same reasons that we conclude that the beneficiaries of the trust, who were parties to the consent order, and their assignees have standing to seek removal of the trustees, we find that the circuit court acted within its authority in considering their request. We reach this conclusion based on the terms of the consent order itself, as well as its status as an enforceable judgment, "subject to the rules generally applicable to other judgments and decrees." *Long*

---

7. In other words, we have combined appellants' issues I and II.

*v. State,* 371 Md. 72, 82–83, 807 A.2d 1 (2002) (citation and quotation omitted).

Although it is true that, under some circumstances, a party may contractually forego its right either to bring suit or to be entitled to a remedy, and that, under such circumstances, a court may be powerless to act, *see, e.g., First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (observing that "a court must defer to an arbitrator's arbitrability decision when the parties submitted that matter to arbitration"), or it may dismiss a complaint, *see, e.g., Seigneur v. Nat'l Fitness Inst., Inc.,* 132 Md.App. 271, 752 A.2d 631 (2000) (upholding lower court's dismissal of case, under Rule 2–322(c), where plaintiff had signed exculpatory clause relieving defendant of negligence liability), that is not the situation before us.

In the instant case, the consent order contains a provision which, seemingly, leaves the power to appoint successor trustees solely in the hands of the trustees, as it provides that replacement trustees "may only be appointed by" court order "upon recommendation of the Trustees" themselves, "after notice to the beneficiaries and an opportunity to be heard." But, as the court below observed, the consent order is silent as to the applicability of the Estates and Trusts Article and, specifically, the enforcement rights of the parties, as provided under that article. We agree with the circuit court that, in the absence of express language in the consent order, specifically providing that the Estates and Trusts Article does not apply, the trustee replacement provision should be read so as to render it consistent with the Estates and Trusts Article. *See Hastings v. PNC Bank, NA,* 429 Md. 5, 24, 54 A.3d 714 (2012) ("Generally, to determine whether a trustee wields lawful authority to take certain actions in connection with trust matters we look to three different sources: (1) the instrument that creates the trust; (2) applicable statutes; and (3) the common law."); *see also Restatement (Third) of Trusts* § 85 (2007) ("[T]he trustee has, except as limited by statute or the terms of the trust, (a) all of the powers over trust property that a legally competent, unmarried individual has with re-

spect to individually owned property, as well as (b) powers
granted by statute or the terms of the trust[.]").

■ Under ET § 14–101, the circuit court, as noted earlier,
"has general superintending power with respect to trusts."
Within the scope of that general superintending power is the
authority to remove a fiduciary, under ET § 15–112, which is
one of the principal means of enforcement of the terms of the
consent order. As the Supreme Court has observed, the
parties to a consent order "desire and expect" that the terms
of such an agreement will be enforceable as "a judicial decree
that is subject to the rules generally applicable to other
judgments and decrees." *Rufo v. Inmates of Suffolk Cnty.
Jail*, 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992).

We therefore conclude that the circuit court acted within its
authority in considering appellees' request to remove appel-
lants as trustees, because the consent order did not expressly
bar the court from exercising its general superintending pow-
er with respect to the trust, and, furthermore, because the
consent order reflected the parties' "desire and expect[ation]"
that it would be judicially enforceable. *Id.* Finally, we note
that appellants appear to concede this very issue in their reply
brief, where they state that ET § 15–112, "when applied
giving due consideration to the purpose and intent" of the
consent order, gives the circuit court "the authority to re-
move" the trustees "for the reasons specified in the statute."

## III.

Appellants contend that the circuit court erred in removing
them as trustees, because Rosewick Road "failed to offer any
evidence" that they had been derelict in the performance of
their duties. Before we may consider that contention, there is
an apparent anomaly, in the rulings made by the circuit court,
that we must first address: When, at the conclusion of the
final June 23rd hearing in this matter, the circuit court
announced its reasons for removing appellees as trustees, it
appeared to rely only upon ET § 15–112(a)(2)(iii), that is, that
the trustees had "[f]ailed to perform any of [their] duties as

fiduciary, or to competently administer the fiduciary estate," but in its written order, entered on the very same day it had orally announced its decision, the court relied only upon ET § 15–112(a)(1)(iii), that is, that the trustees had "[s]hown [themselves] incapable, with or without fault to properly perform the duties of [their] office."

In defending that ruling, appellees have argued only that there was sufficient evidence to support the circuit court's ruling on the latter ground, specifically, that the trustees had shown themselves "incapable of performing their duties." Ordinarily, we would deem the alternative ground, that the trustees had failed to perform their duties, as having been forfeited by appellees, in light of their failure to even mention it in their brief.

But, as the circuit court relied on appellants' purported failure to perform their fiduciary duties, at least in its oral ruling, we shall consider both grounds the circuit court found to support its ruling. *See* Md. Rule 8–131(a). In any event, we conclude that neither ground supports the circuit court's decision to remove the trustees.

Under ET § 15–112, the circuit court is required to remove a fiduciary for any of the grounds stated in subsection (a)(1) of that statute, while it has discretionary authority to remove a fiduciary for any of the grounds stated in subsection (a)(2).[8]

---

8. ET § 15–112 ("Removal of fiduciary") provides in part:

 (a)(1) A court shall remove a fiduciary who has:
 (i) Willfully misrepresented material facts leading to his appointment or to other action by the court in reference to the fiduciary estate;
 (ii) Willfully disregarded an order of court;
 (iii) Shown himself incapable, with or without fault to properly perform the duties of his office; or
 (iv) Breached his duty of good faith or loyalty in the management of property of the fiduciary estate.
 (2) A court may remove a fiduciary who has:
 (i) Negligently failed to file a bond within the time required by rule or order of court;
 (ii) Negligently failed to obey an order of court; or

In both subsections relied upon by the circuit court, subsections (a)(1)(iii) and (a)(2)(iii), removal of a fiduciary is predicated upon either inability or failure to perform his or her duties.

In determining what those duties were in the instant case, we look to both the consent order itself as well as the common law. Paragraph 5 of that order provides, in part, that the trust "shall hold" the real property and assets "as a liquidating trust for sale with assets to be distributed to the beneficiaries in accordance with their interests as soon as said sale and liquidation may be prudently completed." Paragraph 6 provides that the trustees "shall have the authority to do all things necessary or helpful to effect the sale of" the real property "in a single transaction or in a number of transactions." It further provides that, "[f]or purposes of sale," the trustees "may, in their discretion, among other things, accept such arrangements for purchaser inspection, independent testing, governmental commitments, approvals and consents as may be customary or appropriate in marketing properties of similar size and condition in the greater Washington–Baltimore Metropolitan area."

Finally, paragraph 6 also provides, as noted earlier, that the trustees "may enter into a sales contract for the entire parcel of Real Property, subject to court approval, at 85% or more of the appraised value of the entire parcel, at any time within 36 months of the date of this consent decree" and that thereafter they may enter into such a contract, "subject to court approval, in any amount." Thus, the consent order gave appellants broad discretion with which to carry out their duties, with no specific time limitation, other than to provide a minimum sales price in the first thirty-six months. What the consent order did require is that the sale and liquidation be "prudently" completed.

The trustees' duty as set forth in the consent order is consistent with a trustee's common law duty, which is "the

---

(iii) Failed to perform any of his duties as fiduciary, or to competently administer the fiduciary estate.

\* \* \*

duty to secure the fair market value of the property and to employ that degree of care, skill and judgment that a reasonably prudent man would exercise in the conduct of a similar sale." *Bourne v. Lloyd,* 100 Md.App. 575, 585, 642 A.2d 270 (1994). "In other words, to exercise that diligence and caution which a careful and prudent owner would observe in the sale of his own property." *Gould v. Chappell,* 42 Md. 466, 470 (1875).

But what does the duty to act "prudently" entail? To answer that question, we shall examine in detail four Maryland appellate decisions which illustrate either the trustees' failure to meet this standard or their success in doing so and thereby provide a framework for our analysis. In three of those decisions, *Gould v. Chappell,* 42 Md. 466, *Knight v. Nottingham Farms, Inc.,* 207 Md. 65, 113 A.2d 382 (1955), and *Feldman v. Feldman,* 234 Md. 173, 198 A.2d 257 (1964), the Court of Appeals held that trustees or other fiduciaries had failed to act "prudently" in the sale of trust or estate property. But, in the fourth case, *Bourne v. Lloyd,* 100 Md.App. 575, 642 A.2d 270, this Court held that the court-appointed special administrator had met this standard, and, in so holding, we delineated the circumstances under which a trustee fulfills such a duty.

We now turn to the first of those four cases, *Gould v. Chappell.* In that case, two brothers were named, under the will of their late father, as trustees of his testamentary estate. The will, which was admitted to probate in 1859, *id.* at 470, directed the trustees to sell a twenty-acre tract of real property, belonging to that estate, "after the first day of January, 1870, either at public or private sale, in their discretion, and in such lots or parcels as they might deem best." *Id.* at 469. The will further provided that the sale's proceeds be distributed to certain beneficiaries named in the will. *Id.*

In 1872, the trustees sold the tract at issue, at a private sale. Although the trustees claimed that, during the two-and-one-half-year period, from January 1870 until the sale was completed, they "frequently" tried to sell the property, "at

public and private sale, both in small and large parcels," the record showed that they had offered the entire tract only once at a public sale, and one of the trustees had also offered the parcel to several prospective purchasers for a private sale, but "*at prices* far in advance of" what the tract was ultimately sold for. *Id.* at 470–71 (emphasis in original). The named beneficiaries filed exceptions to that sale, but the lower court dismissed their exceptions and ratified the sale, whereupon the beneficiaries appealed.

The Court of Appeals reversed. It began its analysis with the observation that "an interval of a few years" may have a significant effect on the value of "unimproved real estate lying upon the outskirts of a growing city," and what might have been "a judicious mode of selling" such property at one time "may be an injudicious and disadvantageous mode . . . thirteen years afterwards." *Id.* at 470. It further observed that the trustees attempted neither to subdivide the parcel nor to offer it for sale by frontage, despite testimony, at the exceptions hearing, that "this was the proper and judicious mode of selling the property" and that an adjacent parcel of land was sold by a different owner, nine months after the conveyance at issue in *Gould*, "by the front foot" instead of per acre, resulting in a per acre price of more than double what the trustees had received. *Id.* at 470–71. Furthermore, although the sales contract exempted the purchaser from payment of interest until ratification of the sale, the trustees, noted the Court, took "no steps" towards ratification for more than a year. *Id.* at 472.

In light of these facts, the Court reversed the lower court's order ratifying the trustees' sale, declaring that where a trustee "is clothed with large discretionary powers" as to the time, manner, and terms of sale, it is his duty "to bring the property to the hammer in a judicious and advantageous manner," and, if he "fail[s] to exercise that caution and prudence which may fairly and reasonably be expected from a provident owner in regard to the sale of his own property," and, in consequence thereof, the property is sold at a "depreciated price," then a court of equity will not sanction such a sale,

"even though the conduct of the trustee may be untainted with fraud, and the purchaser be without fault." *Id.* at 473.

In *Knight v. Nottingham Farms, Inc., supra,* 207 Md. 65, 113 A.2d 382, executors of a will were directed by that will to sell the testator's real estate within two years of his death. The will granted them "full power" to do so, "without application to or authorization by any court," *id.* at 67, 113 A.2d 382, though any sale was subject to judicial ratification, under a statute then in effect.[9]

Within a few weeks of their appointment, the executors' counsel received, from a real estate broker named "E.H. Nicholson," an unsolicited bid for the property at issue, an undeveloped tract of marsh land along the Big Gunpowder River, for $13,000, subject to a five percent real estate commission. *Id.* at 67–68, 113 A.2d 382. This tract, like the one in the case now before us, was described by a deed, though its "exact acreage [was] not known and [could not] be ascertained from" the land records. *Id.* at 67, 113 A.2d 382.

The offer submitted by Nicholson had been signed by a "Charles Scheeler," who, it was later revealed, was a straw purchaser acting on behalf of a corporation, C.J. Langenfelder & Son, Inc., though Nicholson did not disclose that fact to the executors' counsel at the time he submitted the offer. *Id.* at 68, 113 A.2d 382. When the offer was conveyed to the executors by their counsel, they responded with a counteroffer, accepting Scheeler's proposal, subject to certain conditions. Unwilling to accept those conditions, Scheeler rejected the counteroffer. *Id.*

Nearly two months later, the executors entered into a contract to convey the marsh land to a different purchaser, Nottingham Farms, Inc., a company "engaged in the sand and

---

9. Maryland Code (1951), Art. 93, § 312, provided in part that, "[in] all cases where an executor may be authorized and directed to sell the real estate of a testator, such executor may sell and convey the same, and shall account therefor to the orphans' court of the county where he obtained letters, in the same manner that an executor is bound to account for the sales of a personal estate[.]"

gravel business," for a net price of $13,000, subject to the same conditions which Scheeler had previously rejected. *Id.* at 68–69, 77, 113 A.2d 382. Four days after that, the executors filed an inventory of the real estate belonging to the testamentary estate. That inventory stated that the marsh land at issue, "together with some acreage on the opposite" shore of the Big Gunpowder River, had been appraised at only $2,500.[10] *Id.* at 67, 113 A.2d 382.

Shortly after filing the inventory, the executors reported the private sale of the marsh land tract to Nottingham Farms, Inc., and the orphans' court thereafter issued an order that the sale be ratified "unless cause to the contrary be shown" by a certain date. *Id.* at 69, 113 A.2d 382. Before that date, the president of C.J. Langenfelder & Son, Inc., submitted a contract to the executors to purchase the same tract of marsh land, for $14,000, subject to a five percent real estate commission, that is, for a net price $300 greater than what Nottingham Farms, Inc., had just agreed to pay for the same land. *Id.* Apparently that contract prompted the testator's widow to file exceptions to the sale to Nottingham Farms, Inc., alleging "that $13,000 was not the best price that could be obtained for the property," as a higher offer had subsequently been submitted by C.J. Langenfelder & Son, Inc. *Id.*

At the exceptions hearing that followed, Roszel C. Thomsen, the attorney for C.J. Langenfelder & Son, Inc., at first argued that the sale to Nottingham Farms, Inc., for $13,000 should not be ratified and that, instead, the $14,000 offer from C.J. Langenfelder & Son, Inc., should be accepted. *Id.* at 69–70, 113 A.2d 382. As the hearing progressed, Thomsen increased his client's offer twice, eventually arriving at a final figure of $18,000 net, and, in the alternative, he proposed that, should the orphans' court decide not to ratify the sale to Nottingham Farms, Inc., and if the property were thereafter offered for

---

10. The discrepancy between the Nottingham Farms, Inc., sale price and the appraisal is explained by the fact that the land had been "previously regarded before the Scheeler offer as ordinary marsh land." *Knight v. Nottingham Farms, Inc.,* 207 Md. 65, 78, 113 A.2d 382 (1955).

sale at public auction, his client would "start the bidding off at" $18,000. *Id.* at 70, 113 A.2d 382. Then, to demonstrate that his client's offer was bona fide, Thomsen submitted both a down payment check and a bond, underwriting the offer. *Id.* Nonetheless, the orphans' court dismissed the exceptions and ratified the sale to Nottingham Farms, Inc. *Id.* at 70, 79, 113 A.2d 382.

The Court of Appeals reversed. Although the Court found that the executors had acted "in the utmost good faith, believing at the time that the price" offered by Nottingham Farms, Inc., "represented the full value of the property," it concluded they had not acted prudently. *Id.* at 72, 113 A.2d 382. Because the executors did not "engage any realty companies to sell the property," *id.* at 77, 113 A.2d 382; did not "advertise it or show it to prospective customers," *id.;* did not "obtain expert advice as to the value of the property," even after receiving an offer which was more than five times its appraised value, *id.* at 78, 113 A.2d 382; and, in sum, did "nothing other than remain dormant and receive such offers as might be brought to them" and "apparently made no substantial effort to obtain a better offer," the Court concluded that "there was no assurance that any sale of this land, previously regarded before the Scheeler offer as ordinary marsh land, was fair and just to the owners," and it reversed the orphans' court's order ratifying the sale to Nottingham Farms, Inc. *Id.*

In *Feldman v. Feldman, supra,* 234 Md. 173, 198 A.2d 257, which also involved an executor's sale of real property, which was part of a testamentary estate, the testator's son and the executor of his estate, Herman O. Feldman, "was empowered to sell" the estate's property "at public or private sale." *Id.* at 175, 198 A.2d 257. Included in the estate was a waterfront lot, which had been appraised, by two court-appointed appraisers, at $3,500. *Id.* Thereafter, the executor appeared in the orphans' court and notified it that he had arranged a private sale of the waterfront property to his nephew for $2,500. *Id.*

The orphans' court ordered a new appraisal. That appraisal determined that the property was worth only $2,000. *Id.* When the executor thereafter reported the sale of the land to his nephew for $2,500, exceptions were filed by the executor's brother, Robert G. Feldman, who was also a beneficiary of the testamentary estate. *Id.* Attached to the exceptions was a written offer from a Josephine G. Knight, who lived near the property at issue, to purchase it for $3,500. *Id.*

At the ensuing exceptions hearing, Herman Feldman admitted that he had made no "effort to sell the property until six months after" becoming the executor; that he did not advertise the property, either by posting or by publication; that he did not hire a realtor to help dispose of the property; and that, in fact, the "only action" he had taken, prior to receiving his nephew's $2,500 offer, was "to contact two parties [Robert Feldman] [had] told him were interested" in buying the property. *Id.* at 176, 198 A.2d 257. Ms. Knight, for her part, testified that her offer of $3,500 "still stood" and that she was "willing and able" to pay that amount in cash. *Id.* At the conclusion of the exceptions hearing, the orphans' court dismissed the exceptions and ratified the sale of the waterfront property to the executor's nephew for $2,500. *Id.*

The Court of Appeals, relying upon *Gould v. Chappell, supra,* and *Knight v. Nottingham Farms, Inc., supra,* reversed. Because the executor "did nothing other than to contact the two prospects mentioned by his brother" and he did not make "any effort at all to obtain a higher price than that offered by his nephew," the Court concluded that the executor "did not act in a prudent, diligent and businesslike manner, in order to obtain as large a price as might fairly be obtainable," and it ordered that the sale to the nephew be set aside. *Id.* at 178, 198 A.2d 257.

In contrast to the previous three cases, in *Bourne v. Lloyd,* 100 Md.App. 575, 642 A.2d 270, *supra,* we held that a court-appointed special administrator had acted with reasonable diligence in selling real estate belonging to a testamentary estate and thus affirmed the orphans' court's order ratifying

the sale. There, the testator's will granted the personal representative of his estate "full discretionary power" to take "any action desirable for the complete administration" of the estate, including "the power to sell, at public or private sale, any real ... property" it owned. *Id.* at 579, 642 A.2d 270.

A dispute ensued among the beneficiaries as to a "principal asset of the estate," a large parcel "containing at least 100 acres of land" in southern Maryland. *Id.* Unable to resolve that dispute, the three co-personal representatives of the estate tendered their resignations, and the orphans' court appointed a special administrator, Richard D. Lloyd, granting him "full authority" to "manage and sell the estate's real property in a fair and expeditious manner," subject to court approval. *Id.* at 579–80, 642 A.2d 270.

Upon his appointment, Lloyd "had a title search done, made a physical tour of the property, and engaged a local engineering firm ... to advise him on the best use or development potential of the property." *Id.* at 580, 642 A.2d 270. Next, he had "an independent appraisal" performed by a local appraiser, which established that the property was worth $540,000. *Id.* Then, deciding that it would be "appropriate" to offer the property to family members and other interested persons, through a private sale using a "sealed bid process," with a minimum cash bid of $600,000, Lloyd mailed solicitation letters to "family members and about one dozen others who had either expressed interest or had inquired about the sale." *Id.* at 580, 584, 642 A.2d 270. Among those who received the solicitation letter were "at least three prominent local builders/developers, a realtor, ... a state senator, and an environmental organization that had expressed" a desire to buy the property. *Id.* at 580, 642 A.2d 270.

Of those solicited, only one submitted a bid for the parcel, and that bid was in the amount of $606,000. Lloyd then petitioned the orphans' court to approve the sale. *Id.* James Bourne, a beneficiary and one of the three former co-personal representatives, opposed the petition, contending that "the manner in which the property had been offered was inade-

quate to assure the best and highest price." *Id.* at 580–81, 642 A.2d 270. The orphans' court disagreed and approved the sale, prompting Bourne to appeal. *Id.* at 581, 642 A.2d 270.

We affirmed, rejecting Bourne's complaint that Lloyd had "failed to act with diligence and in a prudent and businesslike manner, [as] evidenced by the method used to value the property and the manner in which the property was offered for sale." *Id.* We began our analysis with the observation that obtaining a " 'sound appraisal of the property' " is "the first step in the exercise of prudence, diligence and care" in setting a sale price. *Id.* at 583, 642 A.2d 270 (quoting *Webb & Knapp, Inc. v. Hanover Bank,* 214 Md. 230, 244–45, 133 A.2d 450 (1957)). Then, noting that Lloyd had used an appraiser, from "a neighboring county," who had appraised other properties in the same county and had commissioned a local engineering firm to advise both him and the appraiser as to the land's development potential, we concluded that the appraiser "was able to give an informed appraisal based on his review of all the information available," and, consequently, Lloyd's method of valuing the property was "sound." *Id.*

Turning next to the method of conducting the sale, we pointed out that, under the terms of the will, a public sale was not required, nor did due diligence impose such a requirement. *Id.* at 584, 642 A.2d 270. We further noted that the "sealed bid process," employed in that case, "was chosen to encourage competition while ensuring a minimum sale price of $600,000," and that "such a procedure could very well produce a higher selling price than an auction sale." *Id.* We therefore agreed with the orphans' court that Lloyd had "exercised his duties with due diligence." *Id.* at 585, 642 A.2d 270.

The four cases, which we have just summarized, stand for the proposition that "diligence" is of utmost importance in determining whether a fiduciary has discharged his duty to act prudently. Thus, in all three of the cases, where the Court of Appeals held that the fiduciaries had failed to act prudently in disposing of trust property, the fiduciaries had not acted diligently, whereas in the case where we reached the opposite

conclusion, the fiduciary had, indeed, acted with due diligence. Specifically, the Court of Appeals observed, in *Feldman,* 234 Md. at 178, 198 A.2d 257, that the executor "did nothing" and made no "effort at all to obtain a higher price"; in *Knight,* 207 Md. at 78, 113 A.2d 382, it declared that the executors "apparently made no substantial effort to obtain a better offer"; and, in *Gould,* 42 Md. at 470–71, pointing out that the trustees offered the property only once at public sale, it concluded that the trustees had not followed a "proper and judicious mode of selling the property." In sharp contrast, in *Bourne,* 100 Md.App. at 583–85, 642 A.2d 270, we concluded that, where the special administrator had obtained a "sound appraisal," compiled a list of prospective bidders, and sold the property through a "sealed bid process," he had, indeed, "exercised his duties with due diligence."

Moreover, in all of the cases where there was a failure to act prudently, there was evidence that the fiduciaries' lack of diligence led directly to property sales at depressed prices, whereas in the case where we held to the contrary, *Bourne v. Lloyd,* there was no such evidence and, indeed, the evidence, in *Bourne,* suggested that the price obtained represented fair market value. To be more specific, the property at issue sold for $2,500 in *Feldman,* 234 Md. at 176, 198 A.2d 257, despite a standing cash offer for $3,500; for $13,000 in *Knight,* 207 Md. at 77, 113 A.2d 382, despite an offer for $18,000; and for $2,500 per acre in *Gould,* 42 Md. at 470–71, whereas adjacent land was sold contemporaneously for more than $5,000 per acre.

 Therefore, in considering whether appellants acted prudently, we must determine whether they "exercised the requisite degree of diligence and care" in attempting to sell the trust property. *Bourne,* 100 Md.App. at 585, 642 A.2d 270. The factors we will consider include their "efforts to determine the value of the property sold," their "method of offering the property," and whether they "closed the sale without endeavoring to obtain better bids." *Id.*

To begin with, we agree with appellants that there was no evidence adduced below that they ever failed to "exercise[ ] the requisite degree of diligence and care" in attempting to sell the trust property. *Id.* The uncontroverted evidence adduced below shows that appellants worked diligently not only to ascertain but also to enhance the property's value. Shortly after accepting their appointments, they inspected the property and determined that it presented serious problems affecting its value and marketability: It was an "irregularly shaped parcel" of "undetermined" size; it had been mined "extensively" for gravel; it contained wetlands; it lacked access to public highways; and it lacked public water and sewer service. The effects of these factors had a significantly adverse impact on the property's value.

Appellants sought the advice of legal counsel, Linowes and Blocher, LLP, a firm which was already familiar with the property, as it had represented the executor of the Frank E. Connell estate. They then retained a local engineering firm, Bolton Latham, LLC, to assess the site and commissioned an appraisal of the property. They learned from the appraiser that the value of the property was dramatically affected by the problems previously noted. Negotiations with local governmental officials followed. As a result of those negotiations, they obtained highway access to the property through the St. Charles Parkway extension.

But appellants' attempts to ascertain the property's value and to enhance that value were successful, as confirmed in 2006 and 2007, when they received two offers to purchase the property for $10.5 million, more than three times the amount for which it had been appraised in 2001. That neither of those offers resulted in a sale was not appellants' fault, nor did the circuit court find otherwise.

Moreover, appellants' methods of marketing the property, attacked by appellees and deemed inadequate by the circuit court, were, in our view, reasonable exercises of the "large discretionary powers" conferred upon them by the consent order. *Gould,* 42 Md. at 473. Given the formidable obstacles

appellants faced when they first assumed their duties, it is hardly surprising that it was not until nearly eight years later that they entered into the first sales contract with KLM. When that contract, as well as the one which followed with TC Fund, did not lead to a completed sale, they then were faced with the deepest economic downturn since the Great Depression. It is undisputed that the economic downturn had a profoundly negative effect on the southern Maryland real estate market. Moreover, appellants' subsequent refusal to accept either the Berman offer or the Facchina offer, at distress prices, was hardly an abuse of their discretion. Indeed, they were rightly concerned that, should they accept either offer, they could expose themselves to liability for breach of fiduciary duty.

The efforts by appellants that followed were no less reasonable. Although appellees make much of appellants' failure to obtain an updated appraisal after the onset of the recession, they ignore the fact that appellants had consulted, over a three-year period, with a leading commercial real estate broker in the relevant market, Harry Shasho, and ultimately hired him to help sell the property. Appellants reasonably relied on Shasho's advice and expertise in setting a listing price of $10.95 million and, thereafter, in seeking a new appraisal from Jane Gatewood.

As for appellants' alleged "stubbornness and inflexibility" in refusing to accept Rosewick Road's low offer, an allegation that apparently had a significant impact on the circuit court, we think that Rosewick Road's self-serving contention ignores appellants' duty to seek "better" bids before closing a sale, *Bourne,* 100 Md.App. at 585, 642 A.2d 270, a duty, all the more pressing, due to the low amount offered by Facchina Construction, Rosewick Road's affiliate.

Finally, the facts in this case are far more similar to those in *Bourne* than they are to *Feldman, Knight,* or *Gould.* Appellants worked diligently for more than a decade to attempt to sell the property. That is a far cry from what occurred in *Feldman,* 234 Md. at 178, 198 A.2d 257 (observing

that the executor "did nothing" and made no "effort at all to obtain a higher price"); *Knight,* 207 Md. at 78, 113 A.2d 382 (observing that the executors "apparently made no substantial effort to obtain a better offer"); or *Gould,* 42 Md. at 470–71 (noting that the trustees offered property only once at public sale over two-and-one-half-year period and did not follow "proper and judicious mode of selling the property"). Here, as in *Bourne,* appellants twice obtained "sound" appraisals, compiled a list of prospective bidders, and contracted to sell the property with two different bidders, albeit unsuccessfully. 100 Md.App. at 583–85, 642 A.2d 270.

As to adequacy of price, the instant case is quite unlike *Feldman, Knight,* and *Gould.* Indeed, if appellants had acquiesced in Rosewick Road's aggressive attempts to obtain the property at a distress price and accepted its affiliate's 2009 offer, instead of rejecting it as they did, this case would be more akin to *Feldman, Knight,* and *Gould,* where a *lack* of due diligence and prudence by the trustees was found, than to *Bourne,* where the fiduciary's actions supported a contrary finding.

It appears that the circuit court believed that appellants had "failed" in fulfilling their fiduciary duties because they had not succeeded in selling the property over a thirteen-year period. But, as *Gould* suggests, there may be circumstances under which it is far more prudent not to sell, than to sell at a distressed price. 42 Md. at 470. Applying the standard of review applicable to non-jury trials, *see* Md. Rule 8–131(c),[11] we observe that "[a] finding is 'clearly erroneous' when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525,

---

11. In *Shipley v. Crouse,* 279 Md. 613, 370 A.2d 97 (1977), the Court of Appeals, in reviewing a circuit court's dismissal of a complaint seeking removal of trustees, under ET § 15–112, applied former Rule 886, which is the direct antecedent to Rule 8–131(c). *See id.* at 629, 370 A.2d 97 ("We cannot say that the facts found by the court were clearly erroneous, Rule 886.").

92 L.Ed. 746 (1948). Here, the only evidence supporting the circuit court's finding is the lengthy delay in selling the property combined with appellants' refusal to sell at a severely distressed price. Viewed in light of the overwhelming evidence to the contrary, that is, that appellants at all times acted diligently, we are "left with the definite and firm conviction that a mistake has been committed." *Id.* The circuit court clearly erred in concluding that appellants had failed to perform their fiduciary duties under ET § 15–112(a)(2)(iii).

As to whether appellants have "[s]hown [themselves] incapable, with or without fault to properly perform the duties of" their offices, ET § 15–112(a)(1)(iii), there was, if anything, even less basis for the circuit court's ruling. Given all of the actions taken by appellants to market the property, enhance its value, and obtain a reasonable price for it, there is simply no basis upon which the circuit court could have concluded that appellants have "[s]hown [themselves] incapable, with or without fault to properly perform the duties" of their offices.

**JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY VACATED; CASE REMANDED WITH INSTRUCTIONS TO REINSTATE APPELLANTS AS TRUSTEES; COSTS TO BE PAID BY APPELLEES.**